# IN THE SUPREME COURT OF IOWA

No. 17–1579

Filed June 29, 2018

**PLANNED PARENTHOOD OF THE HEARTLAND** and **JILL MEADOWS,**

Appellants,

vs.

**KIMBERLY K. REYNOLDS** ex rel. **STATE OF IOWA** and **IOWA BOARD OF MEDICINE,**

Appellees.

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

Appellants challenge the constitutionality of a statute that requires women to obtain certification that they completed a number of requirements at least seventy-two hours before having an abortion. **REVERSED.**

Alice Clapman of Planned Parenthood Federation of America, Washington, D.C., and Rita Bettis of American Civil Liberties Union of Iowa Foundation, Des Moines, for appellants.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, and Thomas J. Ogden, Assistant Attorney General, for appellees.

Roxanne Conlin of Roxanne Conlin & Associates, P.C., Des Moines, for amicus curiae Iowa Coalition Against Domestic Violence, et al.

Heather Shumaker of National Abortion Federation, Washington, D.C., and Sally Frank, Des Moines, for amicus curiae National Abortion Federation.

Melissa C. Hasso of Sherinian & Hasso Law Firm, Des Moines, and Angela C. Vigil of Baker & McKenzie LLP, Miami, Florida, for amicus curiae Biomedical Ethicists.

Bob Rush of Rush & Nicholson, P.L.C., Cedar Rapids, and B. Jessie Hill of Case Western Reserve University, Cleveland, Ohio, for amicus curiae Iowa Professors of Law and of Women's Studies.

Kimberly A. Parker and Lesley Fredin of Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Paloma Naderi of Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts; and Paige Fiedler of Fiedler & Timmer, Johnston, for amicus curiae American College of Obstetricians and Gynecologists.

Frank B. Harty of Nyemaster Goode, P.C., Des Moines, and Paul Benjamin Linton, Northbrook, Illinois, for amicus curiae Iowa Catholic Conference.

**CADY, Chief Justice.**

In this appeal, we must decide if the constitutional right of women to choose to terminate a pregnancy is unreasonably restricted by a statute that prohibits the exercise of the right for a period of seventy-two hours after going to a doctor. In making this decision, we recognize the continuing debate in society over abortion and acknowledge the right of government to reasonably regulate the constitutional right of women to terminate a pregnancy. In carefully considering the case, we conclude the statute enacted by our legislature, while intended as a reasonable regulation, violates both the due process and equal protection clauses of the Iowa Constitution because its restrictions on women are not narrowly tailored to serve a compelling interest of the State. The State has a legitimate interest in informing women about abortion, but the means used under the statute enacted does not meaningfully serve that objective. Because our constitution requires more, we reverse the decision of the district court.

### I. The Judiciary.

We begin by reflecting on the role of the judiciary within our venerable system of government. The Iowa Constitution, like its federal counterpart, establishes three separate, yet equal, branches of government. Iowa Const. art. III, § 1. Our constitution tasks the legislature with making laws, the executive with enforcing the laws, and the judiciary with construing and applying the laws to cases brought before the courts.

Our framers believed "the judiciary is the guardian of the lives and property of every person in the State." 1 *The Debates of the Constitutional Convention of the State of Iowa* 229 (W. Blair Lord rep., 1857) [hereinafter *The Debates*], http://www.statelibraryofiowa.org

/services/collections/law-library/iaconst. Every citizen of Iowa depends upon the courts "for the maintenance of [her] dearest and most precious rights." *Id.* The framers believed those who undervalue the role of the judiciary "lose sight of a still greater blessing, when [the legislature] den[ies] to the humblest individual the protection which the judiciary may throw as a shield around [her]." *Id.*

Unlike the United States Constitution, the Iowa Constitution begins with the Bill of Rights. Our framers were mindful that the

> annals of the world . . . furnish many instances in which the freest and most enlightened governments that have ever existed upon earth, have been gradually undermined, and actually destroyed, in consequence of the people's rights not being guarded by written constitutions.

*Id.* at 100–01. Accordingly, "[t]he object of a Bill of Rights is to set forth and define powers which the people seek to retain within themselves." *Id.* at 154. Some perceived Iowa's Bill of Rights to be "of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights." *Id.* at 103; *cf. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 407, 91 S. Ct. 1999, 2010 (1971) (Harlan, J., concurring) ("[I]t must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities . . . .").

No law that is contrary to the constitution may stand. Iowa Const. art. XII, § 1. "[C]ourts must, under all circumstances, protect the supremacy of the constitution as a means of protecting our republican form of government and our freedoms." *Varnum v. Brien,* 763 N.W.2d 862, 875 (Iowa 2009). Our framers vested this court with the ultimate

authority, and obligation, to ensure no law passed by the legislature impermissibly invades an interest protected by the constitution.

Constitutional guarantees, such as the rights to due process and equal protection of the law, limit the power of the majoritarian branches of government. The purpose of such limitation is to "withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *Id.* (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185 (1943)). One delegate during our state's constitutional convention emphasized the importance of vesting the authority to interpret our most sacred individual rights in the hands of an entity

> in regard to which we can say, there is no political taint or bias, there is no parti[s]an complexion to it; it is of such a character that when we go before it to have our dearest rights decided, we may rest assured that they will be decided upon principles of law and equity, and not upon political or party principles.

1 *The Debates*, at 453.

Here, we are called upon by Iowans to review an act of the legislature they believe infringes upon the Iowa Constitution's guarantees of due process and equal protection. The obligation to resolve this grievance and interpret the constitution lies with this court. "In carrying out this fundamental and vital role, 'we must never forget that it is a *constitution* we are expounding.' It speaks with principle, as we, in turn, must also." *Varnum*, 763 N.W.2d at 876 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819)).

## II. Procedural Background.

On April 18, 2017, the Iowa legislature passed Senate File 471. Division I of Senate File 471 creates new prerequisites for physicians

performing an abortion, including a mandatory 72-hour waiting period between informational and procedure appointments. *See* 2017 Iowa Acts ch. 108, § 1 (codified at Iowa Code ch. 146A (2018)). Division II prohibits performing an abortion upon the twentieth week of pregnancy. *Id.* § 2 (codified at Iowa Code ch. 146B (2018)).

On May 3, anticipating Governor Branstad would sign the bill into law, Planned Parenthood of the Heartland (PPH) moved for a temporary injunction to prevent Division I (the Act) from going into effect. PPH alleged the Act violated the rights to due process and equal protection of the law under the Iowa Constitution. The district court denied the injunction, and PPH sought a stay from this court. On May 5, Governor Branstad signed the law into effect. A few hours later, we stayed the enforcement of the Act per a single-justice order. On May 9, we granted PPH's interlocutory appeal and stayed enforcement of the Act pending a trial on the merits.

The district court subsequently held a two-day trial. At trial, PPH produced five witnesses and an affidavit of a domestic violence expert. The State did not call any witnesses but, instead, offered two sworn statements. Mark Bowden, Executive Director of the Iowa Board of Medicine, indicated the Board would promulgate rules to implement the Act. Melissa Bird, Bureau Chief of Health Statistics at the Iowa Department of Public Health, presented vital statistics on where abortion patients resided in 2014 and 2015. The district court held the Act did not violate the Iowa Constitution.

PPH appealed. We retained the case and stayed enforcement of the Act pending resolution of the appeal. On our review, we will first consider the entire factual record, as developed at the trial court, to determine how the Act will impact the ability of women to obtain an

abortion in Iowa. Following that determination, we will consider whether the Act runs afoul of the due process clause and right to equal protection under the Iowa Constitution.

**III. Abortion Decision-Making and Access Prior to and Under the Act.**

In this section, we recount the facts underlying this case, as presented through witness testimony and exhibits offered at trial. The background and facts of this proceeding are extensive but need to be comprehensively explained and considered for the ultimate decision reached to be fully understood. The evidence and facts are an important part of justice, as is a fair and impartial understanding of the facts.

**A. Planned Parenthood of the Heartland and Abortion Generally.** PPH is a healthcare provider in Iowa that offers reproductive healthcare services. It provides well-woman exams, contraception counseling and care, sexually transmitted infection (STI) evaluations and treatments, preventative care such as cervical cancer screenings and mammogram referrals, and abortion care. PPH predominantly treats poor and low-income women. Over 50% of PPH abortion patients live at or below 110% of the federal poverty line, and many more of its patients live below 200% of the federal poverty line.

Abortion is a medical procedure that terminates a pregnancy. Between 25% and 35% of women in the United States have an abortion during their lifetime. Between April 1, 2016, and March 31, 2017, there were approximately 4000 abortions performed in Iowa. Many reasons have been identified to explain why women choose to have an abortion. Sixty percent of abortion patients already have at least one child and many feel they cannot adequately care for another child. Other women feel they are currently unable to be the type of parent they feel a child

deserves. Patients frequently identify financial, physical, psychological, or situational reasons for deciding to terminate an unplanned pregnancy. Some patients are victims of rape or incest, and others are victims of domestic violence. Women also present with health conditions that prevent a safe pregnancy or childbirth. Sometimes, women discover fetal anomalies later in their pregnancies and make the choice to terminate.

There are two abortion methods: medication and surgical. Medication abortion safely and nonsurgically terminates a pregnancy through the combination of two prescription medications: mifepristone and misoprostol. At the abortion appointment, a patient is given mifepristone, which blocks the hormone necessary to maintain a pregnancy. Then, in her own home within six to forty-eight hours later, the patient takes misoprostol, which causes the uterus to contract and expel its contents, usually within a few hours. The procedure is noninvasive and requires no sedation or anesthesia. Medication abortions are available to patients through their tenth week of pregnancy.

A surgical abortion is the use of instruments to evacuate the contents of a uterus. Most surgical terminations last five to ten minutes, and the patient has the option of receiving sedation. If a patient opts to receive a surgical abortion with sedation, PPH requires the patient to bring an escort. In the past year, PPH performed approximately 2100 medication abortions and 1200 surgical abortions.

Some patients view medication as a less invasive and more natural procedure and prefer to terminate the pregnancy in the comfort of their own homes. Medication avoids needles and surgical instruments inserted into the vagina and cervix, which may be traumatic for victims of sexual assault. Some patients prefer surgical abortion, as it is

completed within a few minutes and the patient is surrounded by physicians and healthcare staff. Occasionally, patients present with medical conditions that make one method a safer option.

Abortion is a safe medical procedure comparable to other office gynecological procedures such as endometrial biopsies, intrauterine device insertions, and cervical cone biopsies. Abortion is a safer procedure than many office medical procedures, including colonoscopies. The risk of death from continuing a pregnancy to childbirth is fourteen times greater than that of an abortion procedure. However, like all medical procedures, abortion has risks. The risks associated with medication and surgical abortions advance with every additional week of gestation.

At the time PPH initiated this suit, it provided surgical abortions at two facilities in Iowa: Des Moines and Iowa City. It provided medication abortions at six facilities: Bettendorf (Quad Cities), Ames, Council Bluffs, Cedar Falls, Burlington, and Sioux City. After the filing of this case, however, the legislature enacted an appropriations bill that discontinued the Federal Medicaid family planning network waiver, eliminating $3,000,000 in federal funds that subsidized family planning services in Iowa. *See* 2017 Iowa Acts ch. 174, § 90 (codified at Iowa Code § 217.41B (2018)). In place of the Federal Medicaid funds, the legislature created a state-run family planning program and allocated comparable state funds to assist low-income patients with family planning services. *Id.* However, the appropriations bill barred payments to "any entity that performs abortions or that maintains or operates a facility where abortions are performed," including PPH. *Id.* § 90(3).

Because PPH provides services such as cancer screenings, STI tests, and contraception to poor and low-income women at little or no

cost to them, a substantial amount of PPH's operating budget comes from reimbursements from Federal Medicaid funds.[1]   Due to a substantial decrease in funding, PPH was forced to close four clinics: Burlington, Keokuk, Sioux City, and most recently, Bettendorf (Quad Cities).   Therefore, PPH currently operates five clinics in Iowa that provide abortion care, and only three clinics outside of Des Moines and Iowa City that provide medication abortions.

**B. Informed Consent and Decision-Making Prior to the Act.** Prior to the Act, if a woman decided to terminate her pregnancy, she contacted PPH and scheduled an appointment.   A PPH abortion appointment has several stages.   The patient first undergoes a medical screening to identify any health risks and potential limitations on the types of procedures available to the woman.   The patient undergoes an ultrasound to date the pregnancy and then is given the option to view the ultrasound and have the image described to her.   The ultrasound also confirms that the woman has an intrauterine, rather than ectopic, pregnancy and ensures there are no anatomical issues that may affect the procedure.   Any patient who expresses an interest in hearing embryonic heart activity, if any, is given the opportunity to do so.   A majority of patients decline these options.

The patient then has her blood drawn to test her Rh factor and hemoglobin levels.   She answers a series of medical screening questions that cover her medical, surgical, and obstetrical history.   At this stage, a patient has her vital signs taken and is screened for common conditions

---

[1]The funds were never used to pay for abortions, pursuant to federal law.   The "Hyde Amendment" prohibits using federal funds to pay for abortions.   *See* Pub. L. No. 94-439, § 209, 90 Stat. 1418, 1434 (1976).   The provision has been reapproved by every Congress since 1976.   *See* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. H, §§ 506–07, 131 Stat. 135, 562 (attaching the Hyde Amendment).

such as hypertension and anemia, as well as any other complicating or prohibitive medical conditions.

Following the medical screening, PPH completes its patient education process and obtains informed consent from the patient. The education process ensures the patient understands the risks, benefits, and alternatives to the abortion procedure. Educators answer all of the patient's medical questions, screen for her decisional certainty, and review the informed-consent document with the patient. Patients receive information about the different methods, the efficacy of the procedure, the common risks associated with the procedure and with continuing the pregnancy, as well as alternatives to the procedure such as parenting and adoption.

PPH staff are specifically trained to conduct a decisional-certainty assessment on every patient and ascertain how firm the patient is in her decision. Educators ask open-ended questions that allow the patient to open up about her decision to make the appointment, difficulties in coming to the clinic, and any questions or concerns she has about the procedure. Patient educators specifically target the patient's motivations and assess whether the patient is truly certain in her decision. As part of the decisional-certainty assessment, educators conduct intimate partner violence screenings, which inquire into whether the patient is safe at home, whether the patient has been threatened or coerced into scheduling the appointment, and whether she has been abused. Educators discuss the alternatives to an abortion and gauge whether the patient has indeed considered other options. As well, educators inquire into whether the patient has discussed the procedure with family, friends, or mentors, or whether she feels unsafe doing so. Further, educators look for "affirmative patients," who speak with affirmations

such as "it is right for me because . . ." and "I feel it is in the best interest of my family because . . . ." Educators are trained to spend as much time as needed with patients in order to completely assess decisional certainty.

Patients are fully informed of the alternatives to the procedure, including parenting and adoption. If a patient expresses any interest in continuing the pregnancy, PPH provides a list of resources for prenatal care, encourages her to begin prenatal vitamins, and can refer patients to obstetricians. PPH has resources for parenting assistance, and educators review all of the information with the patient so she is able to pursue the resources when she leaves the clinic. If a patient expresses an interest in adoption, PPH is partnered with an adoption agency that is willing to travel to meet patients in any PPH health center. If a patient is interested, PPH will facilitate connecting the patient with the agency or will provide additional local resources to pursue adoption. Educators offer patients adoption counseling and can assist patients in creating an adoption plan.

Following patient education, at least 95% of PPH patients remain very firm in their decision to have an abortion. If a patient is not certain, educators speak with her further and help determine the best course of action for the patient given her individual goals, values, and circumstances. If a patient is not completely firm in her decision by the end of the education process, PPH does not perform the abortion and instead advises her to take more time with the decision. If there are any signs of coercion, or that the woman feels pressured by another to have the procedure, PPH does not perform the abortion.

If a patient remains firm following education, the patient then speaks with a PPH physician. The physician again inquires into the

patient's reasons for having the procedure and explains the risks and benefits of the procedure, as well as the risks and benefits of continuing the pregnancy. The physician answers any remaining questions the patient has, as well as ensures the patient is certain in her decision and free of coercion. After the physician confirms the patient's informed consent, the physician will provide the medication or perform the surgical procedure.

PPH educators complete comprehensive training. Educators shadow other staff and managers for a period of time and complete seven interactive modules before they communicate with a patient. Then, educators begin speaking during sessions that are led by trained staff. After a period of supervised sessions, educators begin conducting sessions independently, with trainers periodically listening and conducting random chart audits. During training, educators will speak with managers following their sessions and talk about what they observed, whether there were any emotional cues or red flags, and whether the woman showed confidence in her decision. Beyond this training, PPH educators are evaluated annually.

At trial, PPH offered uncontested evidence demonstrating nearly all patients schedule their abortion appointments after giving considerable thought to their decision and after making a firm decision. The majority of questions patients ask during the education phase relate to the medical procedure itself—usually how to take the misoprostol at home and when to call the clinic. Jason Burkhiser-Reynolds, the Center Manager for the Des Moines clinic, testified that in his experience, almost all patients are firm in their decisions. Burkhiser-Reynolds works with patients individually and frequently acts as a patient educator. In his experience, no patient has ever expressed regret, wished she had more

time, wished she had continued the pregnancy, or believed she was rushed through the education session. PPH offered expert testimony, which the State did not contest, that the vast majority of abortion patients do not regret the procedure, even years later, and instead feel relief and acceptance.

**C. Abortion Landscape in Iowa Prior to the Act.** At the time this suit was filed, Iowa ranked forty-sixth in the nation for obstetrician and gynecologist (OB/GYN) access for reproductive age women.[2] Sixty-six of Iowa's ninety-nine counties do not have an OB/GYN. Only 7.6% of family medicine physicians perform pregnancy ultrasounds in their offices. Because a handful of medical practitioners serve large geographic areas, patients—especially rural patients—must often wait between two to six weeks to see an obstetrician.

Close to half of all Iowa physicians are employed by hospital systems. Approximately 40% of Iowa hospitals are affiliated with Catholic organizations, which prohibit abortion care. Mercy Health Organization, for example, is a major hospital system in Iowa and adheres to Catholic medical directives. Physicians practicing at Mercy, or another Catholic-affiliated hospital, may not participate in or facilitate abortion services or permanent sterilization. "Facilitation" contemplates any action that makes an abortion possible, including faxing patient information to an abortion provider.

PPH performs abortions two or three days a week at its busiest centers. At other centers, abortions are performed one day a week or less. Staff availability and resources determine the schedule. Prior to

---

[2]Since the filing, Iowa has fallen to forty-ninth, with only 1.49 practicing OB/GYNs per 10,000 women. William F. Rayburn, *The Obstetrician–Gynecologist Workforce in the United States* 54 (Am. Cong. of Obstetricians & Gynecologists 2017).

the Act at issue, PPH was able to schedule a patient seeking an abortion within one or two weeks.

Many Iowa women struggle to obtain the procedure of their choice or a procedure at all due to various constraints. First, both medication and surgical abortions are only available during certain windows of a woman's pregnancy. An uncontested provision of the Act imposes a ban on surgical abortions upon the twentieth week of pregnancy. In the past year, PPH performed fifty surgical abortions on women who were within two weeks of the twenty-week cutoff. PPH performed 600 medication abortions on women who were within two weeks of the ten-week cutoff for medication abortions.

There are many reasons women have second trimester or otherwise late-in-window procedures. Most women are not aware of a pregnancy until at least five weeks since their last menstrual period. Some forms of contraception can mask the symptoms of pregnancy, which delays women from discovering a pregnancy by days or weeks. Some patients' life circumstances change drastically between discovery and the decision to terminate. A patient may have lost her job, ended the relationship with her partner, or lost a support system. Significantly, almost no fetal anomalies can be diagnosed until the second trimester when prenatal screening is conducted. Usually, an anatomical ultrasound is not performed until the eighteenth or twentieth week of pregnancy. Thus, some women may not be alerted to a problem until the second trimester, and by the time they have spoken with physicians and made the difficult choice to terminate, they may be very close to, or beyond, the twenty-week cutoff.

Second, poverty plays a significant role in a woman's ability to terminate an unplanned pregnancy. As noted, more than half of PPH's

patients live below 110% of the federal poverty line and many more live below 200% (low income). Nationally, 49% of women seeking an abortion live in poverty, and another 26% are low income. Half of all people living at or below the poverty line have a disability. Women at or near the poverty line have higher rates of unintended pregnancy and abortions than the population as a whole.

Women who wish to have an abortion must not only pay the cost of the procedure, but also any collateral costs such as transportation, child care, lodging, and subsequent medical costs. Hourly and low-wage workers are unlikely to have paid sick or vacation days and, thus, will incur lost wages for any time taken off for the procedure. Poor and low-income families do not have savings, so in order to incur emergency health expenses, they must make hard decisions about leaving bills unpaid or taking on more debt. Many families in this situation rely on alternative financial services, such as payday loans, to finance emergency health costs. Financial hurdles can be extraordinary, and many women are delayed in obtaining the procedure simply due to the time it takes to tap their resources, determine how much money they can raise, arrange for time off work, and find child care. For example, a study[3] conducted by Dr. Deborah Karasek in Arizona just before a twenty-four-hour mandatory delay law was put into effect found the majority of patients opted to forego or delay food, rent, child care, or another essential financial cost to pay for the procedure.

Third, Iowa women must travel significant distances to a PPH clinic. Approximately 35% of surgical patients and 25% of medication

---

[3]PPH offered several studies during trial to establish the factual basis for its claims. The studies were not admitted as exhibits but, rather, read from the witness stand as learned treatises. *See* Iowa R. Evid. 5.803(18).

patients in Iowa travel more than fifty miles to their needed clinic.[4]  Both figures are far greater than the 17% of women nationally who drive more than fifty miles one way to receive an abortion.  Indeed, in 2008, the national median distance traveled to an abortion clinic was fifteen miles.  Thus, women in Iowa travel much farther than the average patient to receive an abortion, which requires greater resources and support.

Fourth, victims of domestic violence and sexual assault also face significant barriers to obtaining an abortion.  The Centers for Disease Control and Prevention (CDC) estimates one-fifth of women in the United States are raped during their lifetime.  The CDC also estimates 31.3% of Iowa women have experienced rape, physical violence, and/or stalking by an intimate partner in their lifetime.  Victims of domestic violence and sexual assault are disproportionately low income.

Reproductive coercion is also observed.  This is a form of domestic violence that involves coercive behavior over a woman's reproductive health.  Abusers understand a woman is less likely to leave the relationship if she has a child.  Abusers may forcibly impregnate women, refuse to wear a condom, or manipulate contraception in order to further their control and dominance.  Between 4% and 8% of all pregnant

---

[4]At trial, the parties disputed how many patients live within fifty miles of their needed clinic.  PPH expert Dr. Daniel Grossman concluded that 47% of surgical patients, and 44% of medication patients live more than fifty miles from their needed center.  The State challenged this data, alleging Dr. Grossman erroneously (1) included women who traveled from out of state in his calculations; (2) included surgical patients who live within fifty miles of any PPH clinic, as they could receive an initial appointment at a closer clinic; and (3) excluded Region 14, which includes the City of Davenport and the then-existing Bettendorf clinic, as a region where women live within fifty miles of a surgical center.  On our review, we agree with the State that the scope of this suit is limited to Iowa, and thus, we have removed out-of-state women from Dr. Grossman's calculations.  However, we find that Dr. Grossman properly sought to determine how many women live more than fifty miles from their needed clinic.  As well, Dr. Grossman properly excluded Region 14, as a significant part of the region was outside the radius of Iowa City, the closest surgical center.

women report experiencing physical abuse during pregnancy. Significantly, women face an increased risk of homicide during pregnancy.

Battered and abused women are often carefully monitored by their abuser. In order to maintain control, abusers check the mileage on the woman's car, nail doors and windows shut, and call the woman at home or at work multiple times during the day. Abusers often check insurance claims and credit card statements, so a victim of domestic violence may need to obtain cash to pay for the procedure. Abusers limit communications to family and friends, so a woman may not have access to people who can loan money or provide transportation. Victims of domestic violence also must keep the pregnancy and decision to terminate a secret from their abusers, so women must manage to overcome all of the above hurdles as quickly as possible, before the symptoms of pregnancy become visible. Managing to go to a doctor's appointment or clinic in secret, even for a single visit, therefore requires significant planning and resources.

As well, victims of sexual assault and incest have unique interests in terminating a pregnancy as quickly as possible, as well as heightened confidentiality concerns. Many rape and incest survivors are extremely distraught, and a pregnancy serves as a constant physical reminder of the assault. For many, termination is an important step in the recovery process. Further, many rape and incest survivors are afraid of disclosing the event to friends and family. Thus, preserving confidentiality and securing the procedure without discovery is paramount.

In sum, women in Iowa face significant obstacles in procuring an abortion. There is scarce OB/GYN access. A majority of PPH patients lives in poverty and must somehow gather the resources to obtain the

procedure, women must travel significant distances to the nearest clinic, and women who are victims of domestic violence or assault face additional barriers beyond those imposed by distance and poverty.

**D. Senate File 471.** On May 5, 2017, Governor Branstad signed into law Senate File 471. The statute was passed with "the intent of the general assembly to enact policies that protect all unborn life." 2017 Iowa Acts ch. 108, § 5. It contains two distinct directives. Division I creates new prerequisites for physicians providing an abortion, and Division II bars performing abortions upon the twentieth week of pregnancy unless the woman's life is in jeopardy. *Id.* §§ 1–2. PPH only challenges Division I.

The Act requires physicians "performing an abortion [to] obtain written certification from the pregnant woman" that she has completed a number of steps at least seventy-two hours prior to the procedure. *Id.* § 1. Accordingly, at least seventy-two hours before an abortion appointment, the woman must obtain certification:

> *a.* That the woman has undergone an ultrasound imaging of the unborn child that displays the approximate age of the unborn child.
>
> *b.* That the woman was given the opportunity to see the unborn child by viewing the ultrasound image of the unborn child.
>
> *c.* That the woman was given the option of hearing a description of the unborn child based on the ultrasound image and hearing the heartbeat of the unborn child.
>
> *d.* (1) That the woman has been provided information regarding all of the following, based upon the materials developed by the department of public health pursuant to subparagraph (2):
>
> (a) The options relative to a pregnancy, including continuing the pregnancy to term and retaining parental rights following the child's birth, continuing the pregnancy to term and placing the child for adoption, and terminating the pregnancy.

(b) The indicators, contra-indicators, and risk factors including any physical, psychological, or situational factors related to the abortion in light of the woman's medical history and medical condition.

*Id.*

The Act permits physicians to perform an abortion without prior certification (1) "to save the life of a pregnant woman," (2) "in a medical emergency," or (3) if "in the physician's reasonable medical judgment [it] is designed to or intended to prevent the death or to preserve the life of the pregnant woman."[5]  *Id.*  For purposes of the Act, an abortion is performed in a "medical emergency" when the procedure is performed

> to preserve the life of the pregnant woman whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy, or when continuation of the pregnancy will create a serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman.

*Id.* § 2(6).  Any physician who violates these provisions may have his or her license suspended or revoked pursuant to Iowa Code section 148.6 (2018).  *Id.* § 4.

**E.  Informed Consent and Decision-Making Under the Act.**

1. *Certification.*   The Act requires a patient be informed of a number of things at least seventy-two hours before the scheduled procedure.   PPH has provided the following uncontested evidence detailing what complying with the certification requirements actually entails in practice.

The standard of care in obstetrics and gynecology is not to perform an ultrasound until the twentieth week of pregnancy.  Patients do not

---

[5]Since the filing of this suit, the legislature has amended this provision.  The Act now provides that an abortion may only be provided without prior certification in a medical emergency.  2018 Iowa Legis. Serv. S.F. 359 (West 2018) (West No. 133).

simply schedule ultrasound appointments for the purpose of dating a pregnancy. Rather, patients contact an obstetrician, establish they are obtaining prenatal care, and then an ultrasound is performed at certain junctions in the pregnancy when it would provide the most valuable information.

Accordingly, obtaining certification is not as simple as making an ultrasound appointment, as PPH and many other healthcare providers do not currently allow early pregnancy patients to schedule only an ultrasound. Indeed, it is PPH's policy to perform and evaluate ultrasounds only for patients coming to the clinic for abortion care. Under the Act, a patient will have to request that PPH (or a local clinic, the feasibility of which is discussed in greater detail below) schedule a specific preabortion certification appointment in order to obtain an ultrasound. PPH acknowledges that it will begin scheduling patients for preabortion certification appointments should the Act be put into effect, although it is contrary to the standard of care.

As well, the Act requires that patients be informed of "indicators, contra-indicators, and risk factors" in light of their specific medical history. Thus, women will have to have blood drawn and analyzed, as well as provide full medical histories and have them reviewed, before a physician can assess the potential risks of the procedure. Unlike PPH, most obstetricians in Iowa do not have lab facilities in their offices, so a patient's blood would have to be drawn and then sent away for analysis. Or, the patient would have to first visit the obstetrician to receive lab orders then go herself to a different phlebotomy clinic for the blood screening. Of course, these steps would need to be completed before she has the initial appointment during which the physician analyzes her medical status and history and informs her of the risks of an abortion. If

a patient went to PPH for an appointment, the entire certification process could be completed in one visit. However, Dr. Jill Meadows, PPH's Medical Director, testified that, in order to schedule double the appointments, women would be required to wait one to two weeks between the certification and abortion appointments.

Finally, during the certification appointment, the woman will be provided materials drafted by the department of public health. PPH offered uncontested evidence that the materials contain medically inaccurate information. For example, the materials state that medication abortion is "usually" performed within forty-nine days of the last menstrual period, when, in fact, it is very commonly performed up to seventy days from a patient's last menstrual period. Indeed, the gestational range specified in the FDA-approved label for mifepristone is up to seventy days. Additionally, the materials state that a surgical abortion "takes about thirty minutes," when in actuality the procedure usually takes between five and ten minutes. As well, the materials inform patients that surgical abortions involve "scrap[ing] the walls of the womb," but most providers, including PPH, do not perform the procedure this way. Dr. Meadows testified that, as a whole, the department's materials overstate the complexities and risks of abortions and understate the availability of the procedure.

2. *Decisional certainty in abortion patients.* At trial, PPH's witnesses discussed several studies of mandatory delay laws enacted in other states and offered significant evidence relating to the decisional certainty of abortion patients.

A centerpiece of both PPH's and the State's arguments is a study authored by Dr. Sarah C.M. Roberts. The Roberts study was conducted

in Utah after the state implemented a 72-hour waiting period.[6]  The study surveyed 500 Utah women at four family planning facilities who attended an informational abortion appointment pursuant to the mandatory delay law.  The researchers attempted to follow up with the women sometime afterwards to see whether the patients obtained an abortion.  The researchers were able to follow up with 309 of the 500 women.

Of the 309 women, twenty-seven reported they were no longer seeking an abortion.  Of these women, eleven entered their appointments with the intention of continuing their pregnancy.  Nine women entered their appointments "somewhat or highly conflicted" about their decisions and had not yet decided whether to have the procedure.  Seven women, or 2% of the 309, entered their appointments certain in their decision to have the abortion and then, following patient education, changed their minds and decided to continue their pregnancy.  The authors of the study noted that in states without mandatory delay laws, between 1% and 3% of patients similarly enter their appointments certain in their decision and, after the patient education process, decide to continue their pregnancies and forego the procedure.  Accordingly, in the Roberts study, the authors found the 72-hour waiting period had no effect on the number of women who changed their minds from being certain in their decision to have an abortion to deciding to continue their pregnancy.

The State urges that, in the Roberts study, the "most common reason [for still being pregnant at follow up] given was that the woman

---

[6]At the time of the study, the Utah law differed from the Act in some respects.  Significantly, the Utah law did not require a patient to have an ultrasound and a physician could complete the certification via telemedicine.  Further, Utah waived the 72-hour waiting period for victims of rape and incest and patients younger than fifteen years old.  *See* Utah Code Ann. § 76–7–305 (West, Westlaw through 2018 Gen. Sess.).

'just couldn't do it.'" Therefore, the State argues, the mandatory delay will ensure that women are given sufficient time to consider the weight of their decision without the influence of providers "who may encourage women who are conflicted to go through with the procedure as quickly as possible so as not to lose a fee."

There is, however, no evidence in the record that PPH has ever pressured a patient to undergo an abortion simply to collect a fee. Furthermore, in the Roberts study, thirty-four women were still pregnant when the researchers followed up with them. Twenty-seven opted to continue their pregnancies, six were still waiting for their appointment, and one woman was prevented from having an abortion because the delay pushed her beyond the clinic's gestational limit. Of the thirty-four women, eighteen reported they "just couldn't do it." Twenty women entered their appointments either intending to continue their pregnancies or conflicted in their decisions. PPH's witnesses explained that under PPH's same-day regime, all twenty women would have been given more time to consider their decision, and the eighteen who opted to remain pregnant would have similarly reported they "just couldn't do it."

Beyond the Roberts study, PPH offered a number of additional studies related to decisional certainty in abortion patients. Dr. Mary Gatter conducted a study in Los Angeles that analyzed roughly 16,000 same-day abortion appointments where patients were given the option of viewing the ultrasound. In the study, 99% of women who declined to view the ultrasound went on to have the procedure and 98.4% of women who opted to view the ultrasound went on to have the procedure. Indeed, the slight association between voluntary viewing and continuing the pregnancy was only present among the 7% of women who reported being conflicted about their decision upon arrival.

PPH's expert, Dr. Daniel Grossman, explained the study drew no conclusion about whether patients were actually influenced by viewing the ultrasound or whether conflicted patients chose to see the ultrasound so they could be pushed toward not having the procedure. He testified the study never concluded that viewing an ultrasound caused uncertain patients to continue with their pregnancy. Furthermore, the Gatter study did not gather data relating to the impact of mandatory delays on patient decision-making, as California does not have a mandatory delay statute.

Dr. Kari White conducted a study in Alabama in 2013. The study reviewed de-identified billing data from two of the five abortion clinics in Alabama while the state's 24-hour mandatory delay law was in effect. The study showed that 18.8% of women did not return to either of the two clinics for a procedure. Dr. Grossman, a coauthor of the study, testified the researchers exclusively reviewed billing data and did not attempt to discern why the women did not return. Further, he testified it was possible that some or all of the women went to another clinic or went out of state for their procedure. Additionally, the study did not assess decision-making. On cross-examination, the State expressly confirmed that, in the study, "there's no attempt to say why. Nobody is asking why they didn't return, so we're not talking about that question." PPH's witnesses clarified that the Alabama study did not find that 18.8% of women did not go through with the abortion, nor did it assess the causal relationship between the waiting period and the decision whether to proceed with an abortion.

PPH additionally offered a second Utah study, authored by Dr. Jessica N. Sanders. The Sanders study has two parts. First, the researchers reviewed abortion statistics following the increase from a 24-

hour delay to a 72-hour delay. Second, researchers reviewed a questionnaire completed by 307 women upon arrival at their procedure appointment. In the first part of the study, the researchers reviewed data and found that 80% of patients returned for their procedure when the 24-hour delay was in effect, and 77% returned when the 72-hour delay was in effect. The authors of the study explained that the first portion of the study was not designed to discern the reasons why the women did not return for their procedure. On cross-examination, the State confirmed the researchers never spoke to the women who did not return. PPH's witnesses explained the study therefore could not, and did not, determine whether the women were prevented from returning or decided not to return.

Dr. Lauren J. Ralph conducted a study that reviewed a sample of women seeking an abortion and compared two different measures of decisional certainty. The study found abortion patients were as or more certain of their decision than patients presenting for other procedures, including mastectomies after a breast cancer diagnosis, reconstructive knee surgery, and prostate cancer treatments.

Dr. Corinne Rocca authored a study that observed a cohort of women receiving first and late second trimester abortions at thirty facilities across the United States. The researchers conducted interviews shortly after the women had their procedure and then conducted interviews every six months for up to three years after the procedure. The researchers concluded the typical participant had an over 99% chance of reporting the decision to terminate her pregnancy was right for her at the follow-up interview.

Finally, Dr. Grossman conducted a study in Texas while a 24-hour mandatory delay law was in effect. The researchers surveyed patients'

decisional certainty prior to their initial informational visit, which included an ultrasound, and after the visit. The study found that 92% of women were sure of their decision prior to their initial appointment. Following the consultation visit and ultrasound, 92% of women reported being sure of their decision.

PPH also offered the expert testimony of three physicians and a PPH health center manager. Dr. Meadows has treated over 10,000 abortion patients. She testified that it is her opinion, based on her interactions and discussions with thousands of patients, that the Act will not impact patient decision-making. She testified patients uniformly give the decision considerable thought before contacting the clinic and PPH educators are trained to discern which patients are insecure in their decisions or may be under duress.

Dr. Susan Lipinski is an OB/GYN in Waterloo. Although she does not perform elective terminations, she regularly counsels women who are undecided about their pregnancies and performs terminations when the health or life of the mother is at risk. She testified that patients are the best judge of whether they are ready to initiate treatment and physicians respect patient autonomy. She further testified that, in her experience, patients would not benefit from taking an additional seventy-two hours to reflect on their already-made decision.

Dr. Grossman is an OB/GYN professor at the University of California, San Francisco. His clinical work focuses on outpatient OB/GYN, including family planning and abortion care. He performs first and second trimester abortions, both medication and surgical. Based on treating thousands of patients, as well as his own research, he testified that the 72-hour delay would not enhance patient decision-making.

Finally, Burkhiser-Reynolds testified about his experiences working with abortion patients at the Des Moines PPH center. In his experience, nearly all patients arrive at their appointments having thoroughly researched and considered their decision. He testified that close to all patients have already considered other alternatives prior to their appointment. Further, he testified that almost all patients are firm in their decision to have an abortion and very rarely is a patient uncertain following the patient education process.

**F. Abortion Landscape in Iowa Under the Act.** PPH offered additional evidence to support its claim that the Act creates unnecessary barriers to accessing abortion in Iowa. We therefore proceed to consider the evidence offered to demonstrate the Act's likely ramifications for Iowa women seeking to have an abortion.

1. *Obtaining certification.* Facially, the Act does not require women to obtain certification from the same clinic or provider that ultimately performs the procedure. The State posits that women could obtain certification from a local provider for little or no additional cost. In response, PPH has offered evidence that Iowa women cannot easily obtain certification from a non-PPH provider.

At the time this suit was filed, Iowa ranked forty-sixth in the nation in OB/GYN access for reproductive-age women. To obtain a diagnostic test, such as an ultrasound, patients normally must schedule an appointment and establish a patient–doctor relationship. Due to the severely limited number of providers in Iowa, many obstetricians are booked several weeks or months in advance.

Most local clinics with family medicine physicians do not have the capacity to perform an ultrasound that includes audible heart tones. Patients seeking certification would have to first schedule a family

medicine appointment, meet with the physician and inform the physician of her desire for an abortion,[7] and then be referred to a radiology center or hospital. Radiology centers and hospitals generally do not perform the type of limited ultrasound used in abortion screenings out of fear of liability for missing a potential defect. Thus, these facilities would require the patient to undergo a more expensive and comprehensive ultrasound.

Radiology centers often do not have a radiologist available in person and, instead, use technicians to perform the ultrasounds. The patient would therefore have to wait again to have a radiologist review the images, which could take hours or days. Once a patient obtains an ultrasound and certification from a local clinic, the facility would need to send the records to PPH, which takes additional time. Many hospitals decline to perform the certification ultrasound altogether due to religious medical directives.

PPH witness Dr. Jane Collins, a poverty expert from the University of Wisconsin, Madison, offered testimony on the difficulties of obtaining certification from a non-PPH provider. To illustrate, Dr. Collins provided the steps hypothetical patients in Ottumwa and Sioux City would need to take in order to comply with the Act and obtain certification from a non-PPH clinic.

The State offered Dr. Collins a list of twenty-six local providers a woman in Ottumwa could visit to receive an ultrasound and obtain certification. After excluding duplicate entries and multiple practices at the same center, Dr. Collins narrowed the options to three facilities, which she then contacted. The first facility did not provide pregnancy

---

[7]PPH urges that this disclosure jeopardizes a patient's confidentiality, particularly in small, rural towns.

ultrasounds. The second facility only performed pregnancy ultrasounds on its own patients. Thus, a woman would need to first travel to the clinic and pay for a new patient visit before having an ultrasound. A new patient visit costs $199 and the ultrasound costs $235. The third facility required a referral from a physician and only used technicians to perform ultrasounds. The image would be sent off-site to a radiologist for an additional, unknown fee, and the woman would wait an unknown period of time before getting her results. An early pregnancy ultrasound at the third facility costs $267, while a later first trimester ultrasound at this facility costs $621.

For the Sioux City patient, the State provided Dr. Collins with a list of ninety-one local providers. After eliminating duplicates and religious facilities, Dr. Collins narrowed the options to just four providers, which she then contacted. The first facility's technician is not qualified to read the ultrasound image. Because the Act requires the woman to have the image described to her, she could not obtain certification from the facility. The second facility does not accept referrals from an abortion provider, nor does it accept referrals for merely an ultrasound. The third facility requires a referral from a physician within its network. The fourth facility only provides pregnancy ultrasounds for preexisting patients.

Evidence was also offered on the ability of women to obtain certification from crisis pregnancy centers (CPCs). This evidence indicated these centers seek to counsel women with unplanned pregnancies toward parenting or adoption. CPCs are generally not licensed medical providers and are not required to comply with federal privacy protections governing health information. PPH offered evidence, which the State did not dispute, that CPCs frequently misinform women

about abortion. For example, many CPCs inform women that abortions increase the risk of breast cancer, despite studies adduced by the American College of Obstetricians and Gynecologists dispelling any association. Dr. Meadows testified that, in her experience, she has worked with patients who received ultrasounds at CPCs who were informed they were weeks or months further along in their pregnancies than they actually were.

Thus, the evidence showed women could incur prohibitive costs and delays under the Act if they sought certification from a local provider. In order to comply with the Act, evidence showed PPH patients will be required to make two trips to a PPH clinic: one for a preabortion certification appointment and another for the procedure.

2. *Financial burden of a second visit.* PPH offered additional evidence relating to the financial resources needed to attend two appointments to comply with the Act.

More than half of PPH patients live in poverty and many more are low income. Dr. Collins offered testimony demonstrating what women in poverty must overcome to obtain an abortion under the Act.

In 2017, a single person earning $12,060 a year or less lived below the federal poverty line. If a woman is married or has a child, an income of $16,240 or less placed her below the federal poverty line. Dr. Collins provided a sample monthly budget representing the average monthly expenditures of the typical PPH abortion patient: living at or below the poverty line with one child. The budget assumes the patient receives all available social services.

Sample Monthly Budget:

| | |
|---|---|
| -$845: | rent |
| -$200: | car payments and related expenses |
| -$150: | utilities |
| -$212: | food after receiving $100 in SNAP benefits |
| -$248: | childcare after $401 subsidy |
| -$ 50: | telephone service |
| -$ 30: | medical co-pays after Medical Assistance |
| -$ 50: | personal care and household care items |
| +$323: | Federal and State Earned Income Tax Credit |
| Total: | $1,462 per month, exceeding the family's monthly income. |

The sample budget demonstrates that, even with taking advantage of all available social services, half of all PPH patients live day-to-day with no savings and an increasing amount of debt. Importantly, the budget does not include the costs of clothing, furniture, school fees, cable or Internet, books, children's toys, or any debt repayment. Thus, to care for themselves and their children adequately, women must realistically spend more than Dr. Collins's budget.

After Texas implemented a 24-hour mandatory delay, patients incurred an average of $141 to pay for the second clinic visit. When a woman living in poverty faces an unplanned pregnancy, she does not have any savings to fall back on and must make difficult decisions about whether to leave bills unpaid or assume debt. Additional expenses of twenty or fifty dollars are substantial for women in poverty who simply do not have the funds at their fingertips.

Poor and low-income women are unlikely to have access to paid sick days or personal days and will suffer lost wages when taking time away from work. Scheduling time off work is difficult for hourly employees, and taking time off twice in two weeks may be very difficult. Indeed, many employers require patients to produce a doctor's note to be

excused from multiple days of work, which compromises poor women's abilities to keep the procedure confidential.

Transportation poses another collateral expense, especially for rural Iowans. Dr. Collins again used the hypothetical Ottumwa and Sioux City patients to illustrate the expected transportation costs of an additional visit to a PPH clinic. Dr. Collins offered two scenarios for each patient: one in which the patient has access to a vehicle and another where the patient must rely on public transportation.

The Ottumwa patient's closest PPH clinic is in Des Moines. The distance from Ottumwa to Des Moines is 84 miles one way, or 168 miles round-trip. Using the average mileage per gallon of vehicles available to low-income women and the average price of gasoline, the Ottumwa patient with access to a vehicle incurs $20.16 in travel costs and three hours of travel time. Using the minimum wage and the average cost of child care for low-income women, the patient incurs $36.25 in lost wages and $25 in child care costs. The total cost of the additional appointment is $81.41.

The Ottumwa patient without a vehicle has a far more difficult road ahead of her. The only bus from Ottumwa to Des Moines leaves at 4:05 p.m. and arrives in Des Moines at 5:35 p.m., after the PPH clinic has closed. Yet, the only bus from Des Moines to Ottumwa departs at 8:55 a.m., before the PPH clinic opens. Thus, the woman must spend two nights in Des Moines. Round-trip bus fare costs $60 and two nights in a budget motel costs $148. The woman incurs $174 in lost wages. A woman cannot leave her child in daycare for three days, so she either must bring the child with her or arrange for a friend or family member to care for the child. The total cost of the additional trip for the Ottumwa patient without a vehicle is $382.

Dr. Collins used a different factual scenario for the Sioux City patient. The Sioux City patient, like many PPH patients, is eight weeks pregnant when she contacts the clinic. Because PPH estimates a one- to two-week delay in appointments under the Act, the patient is able to travel to Council Bluffs, the closest clinic, for the initial appointment within the ten-week medication window, but is unable to schedule the procedure in that window. Thus, the Sioux City patient must travel to the nearest surgical center, Des Moines, for the additional appointment.

The distance one way from Sioux City to Des Moines is 200 miles, or 400 miles round-trip. Using the same average costs for low-income women as above, the Sioux City patient with access to a vehicle incurs $48 in travel costs, $58 in lost wages, and $50 in child care. The total cost of the additional trip is $156.

The Sioux City patient relying on public transportation also has a difficult road ahead of her. The patient takes a bus from Sioux City to Council Bluffs and then another bus from Council Bluffs to Des Moines, arriving at 10:55 p.m. She spends the night in a budget motel and has the procedure the following day. The bus to Council Bluffs departs at 11:15 p.m. and arrives a little after 1 a.m. She spends the night in Council Bluffs and, a little after 6 a.m., boards the bus to Sioux City and arrives at 7:50 a.m. The patient incurs $125 in bus fare, $148 in lodging costs, and $174 in lost wages. The total cost of the additional appointment for the Sioux City patient without a vehicle is $447.

Dr. Collins testified that confidentiality and ethical rules prevent researchers from simply surveying the population and asking about private abortion decisions. She explained that researchers could not go door-to-door, or use a broad survey, and simply ask women if they desired an abortion in the last year but could not obtain one. Data is

instead collected by requesting permission to be interviewed from women who arrive at clinics for an abortion. PPH, therefore, cannot quantify the exact number of women in Iowa who presently face certain barriers to accessing abortion care because that type of studying simply is not done. Instead, Dr. Collins stressed that every year 2000 women who live in poverty seek abortions in Iowa. Those 2000 women live within the financial constraints explored above and do not have spare funds at their disposal.

PPH has offered evidence that gathering financial resources takes time, including asking for days off work, asking family and friends for financial assistance, researching transportation options, and finding child care. Furthermore, PPH offered evidence that the Act will, in fact, require women to raise additional funds, in some instances double the funds, to pay for the additional trip. Thus, the Act will not only considerably increase the cost of an abortion in Iowa, but will also cause a meaningful number of Iowa women to delay their procedure in order to amass the greater resources needed to obtain an abortion.

3. *Other burdens.* Evidence was also presented on the additional burdens imposed by the Act beyond financial hardships.

a. *Prevent abortions.* PPH argues the Act will prevent some Iowa women from having an abortion. Its prevention argument is two-fold. First, the mandatory waiting period will delay women who present for an abortion later in their pregnancies beyond the twenty-week cutoff, thereby denying them the choice of having the procedure. Second, the increased cost of the procedure will be prohibitive for some women, causing them to forego the procedure entirely.

The evidence revealed many reasons women present for an abortion close to twenty weeks into their pregnancy. Many fetal

anomalies or medical conditions are not diagnosed until eighteen or twenty weeks into a pregnancy, resulting in a narrow window for women to obtain an abortion. In the past year, PPH saw fifty patients who were between eighteen and twenty weeks pregnant when they presented for their procedure. Based on this figure, PPH maintains that should these fifty women be required to comply with the Act, some or all will be delayed and pushed beyond the twenty-week cutoff.

Dr. Meadows testified that, should a patient's circumstances allow it and a clinic has an available appointment, it is possible for a patient to be seen in three or four days, rather than one or two weeks. However, she cautioned that such an instance would be an exception, as PPH clinics do not have the capacity to schedule double the appointments without delaying women by one or two weeks. It is therefore unlikely that all fifty women could schedule two appointments before the twenty-week cutoff.

In the Roberts study, the 72-hour delay pushed one woman beyond her clinic's gestational limit, preventing her from having an abortion. Utah's certification requirements were less onerous than the Act, as the certification visit could be completed through telemedicine, did not require an ultrasound, and had exceptions for rape victims, incest victims, and patients under the age of fifteen.

PPH relies on studies to demonstrate the impact of the Act's logistical requirements. In the Sanders study, 62% of women reported the additional delay affected them negatively. Of those women, close to half had to take extra time off work and 15% missed an extra day of school. Forty-seven percent reported lost wages, 18% reported extra child care costs, 30% reported increased transportation costs, and 27% reported additional expenditures and lost wages by a family member or

friend. In Dr. Grossman's Texas study, 23% of women experienced difficulties in getting to the clinic for the consultation appointment. In the study's multivariable analysis, women below the federal poverty line were significantly more likely to report difficulties in getting to the clinic.

The actual costs of an additional appointment vary significantly among studies. Patients paid an average of $44 in Utah and $141 in Texas for the additional appointment.

b. *Prevent medication abortions.* Evidence was also submitted to show the Act would cause some women who prefer medication abortions to be delayed beyond the ten-week cutoff and thereby deny women a meaningful choice about their healthcare. In the past year, 600 patients, or 27% of medication patients, presented for a medication abortion within two weeks of the ten-week cutoff for the procedure.

Dr. Grossman conducted a study on medication abortions in Iowa. In the study, 71% of Iowa women reported having a strong preference for medication abortion. Ninety-four percent of Iowa women expressed that having the procedure as early as possible was very important to them.

Additionally, Ted Joyce, a professor of Economics at Baruch College, conducted a study on the impact of Mississippi's 24-hour mandatory delay law. The study reviewed vital statistics and compared Mississippi women whose nearest clinic was located within the state with Mississippi women whose nearest clinic was located out of state. After the mandatory delay law was placed into effect, the rate of second trimester abortions increased 53% among women whose closest clinic was located within the state. Yet, there was only an 8% increase in second trimester abortions among women whose closest clinic was out of state. The authors concluded that, as more states implement mandatory

delay laws with in-person counseling requirements, the number of abortions performed later in women's pregnancies would increase.

Dr. Sharon Dobie authored a study that compared abortion rates of rural and urban women in Washington during a period when several abortion providers closed. The study found that, after the closings, 73% of rural women traveled more than fifty miles to obtain an abortion. Among those women, there was a significant increase in later abortions, which was not present among urban patients. Indeed, following the closings, the proportion of rural women who had abortions at eighteen weeks into their pregnancy or later doubled.

c. *Increased medical risks.* Evidence was also presented to show the Act exposes women to increased medical risks. While abortion is a safe procedure and, in fact, safer than many office medical procedures, the risk of failed or incomplete medication abortion increases with advancing gestational age. The risks of surgical abortions also increase with gestational age, even week by week. A second trimester abortion is eight to ten times riskier than a first trimester abortion.

Dr. Grossman explained that when women do not have access to abortion care, they do not universally decide to continue with their pregnancies. Rather, some women attempt to take matters into their own hands to terminate their pregnancy, at great risk to their own health and safety. He further testified about his research in Texas where he conducted in-depth interviews with eighteen women who reported attempting to self-induce an abortion. The primary reason women were pushed to self-induce was barriers to accessing clinical care. The women reported having insufficient funds to travel to the clinic, having to travel long distances, and other collateral costs, and these barriers all contributed to their decision to self-induce.

In its amicus brief, the American College of Obstetricians and Gynecologists discussed a 2016 study of Iowa clinics that inquired into self-induced abortions in Iowa. The study found that 30% of Iowa women surveyed had investigated options for clandestine home use of misoprostol, and 8.6% reported prior attempts to self-induce.

d. *Harm to domestic violence and assault victims.* Evidence was also presented to show that domestic violence and sexual assault victims would be harmed by the Act's requirements. Abused women are often carefully monitored by their abusers and an additional trip, therefore, places them at an even greater risk of discovery. Further, abusers often limit communications with a woman's friends and family and sometimes even limit employment options, so abused women already have a difficult time raising funds for a procedure. The prospect of raising additional, potentially double the funds without detection may well be impossible.

PPH stresses that domestic violence is a medical issue. Women who are pregnant are at an increased risk of homicide. Women who are discovered attempting to have an abortion are at an increased risk of physical and emotional abuse. By delaying a victim's abortion until a second appointment, PPH argues the Act subjects women to an increased risk of violence, despite a physician's medical judgment that performing an abortion at the first visit is the safest time for the patient.

In her study of intimate partner violence among abortion clinic populations, Dr. Audrey F. Saftlas surveyed 986 women seeking an abortion in Iowa. The Saftlas study found that 13.8% of the women experienced physical or sexual abuse in the last year, and 10.8% experienced intimate partner abuse in the last year. In the Roberts study, 26% of women who spent their own money on the abortion had to tell someone else they were spending it. Of these women, 77% had to tell

the man involved in the pregnancy, a boyfriend, or a partner about the expenditure. In the Sanders study, 62% of women indicated the 72-hour delay negatively affected them. Of those women, one-third reported having to tell someone about the procedure they would not have told if the delay was only twenty-four hours.

With respect to sexual assault victims, PPH urges that the mandatory waiting period will cause additional psychological harm. A pregnancy that results from rape or incest is a constant reminder of the assault, which is traumatizing for victims. Furthermore, requiring victims to arrange to be away from work, school, or family obligations twice will increase the risk of discovery, jeopardize their privacy, and place them at risk of further emotional harm. Unlike other similar statutes, the Act does not have an exception for rape victims.

**G. District Court Decision and Positions on Appeal.** Following the two-day trial, the district court considered the offered evidence and found the percentage of Iowa women who may change their minds and decide to continue their pregnancies due to the waiting period "may be at least eight percent" or higher. The court based this figure on the Roberts Utah study, the Gatter Los Angeles study, the White Alabama study, and the Sanders Utah study. The court ultimately found that a "measurable number of women" may change their minds and the Act's burdens did not amount to a substantial obstacle for women seeking an abortion. Therefore, the court found the Act did not violate the due process clause. The court similarly rejected PPH's equal protection claim.

On appeal, PPH argues that the district court's factual conclusions are unsupported by the record. PPH maintains the Act imposes severe difficulties on women seeking abortions and, in some cases, will prevent women from obtaining an abortion entirely. Moreover, PPH argues the

district court's "eight percent" figure is based on a misreading of several studies. PPH additionally asks that we depart from federal precedent and apply strict scrutiny when reviewing state actions that infringe on the right to choose to terminate a pregnancy.

The State, conversely, urges that the Act's 72-hour delay is not facially unconstitutional, as PPH has not established that the Act cannot be constitutionally applied to any set of facts. Further, the State argues that abortion is not a fundamental right under the Iowa Constitution and we should decline to adopt a separate standard from federal precedent.

### IV. Standard of Review.

We review constitutional claims de novo. *Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med.*, 865 N.W.2d 252, 261 (Iowa 2015).

PPH brings a facial challenge to the Act. When reviewing challenges to abortion statutes, the proper scope of a facial challenge is subject to debate. Generally, to succeed on a facial challenge, the petitioner must prove a statute is "totally invalid and therefore, 'incapable of any valid application.'" *Santi v. Santi*, 633 N.W.2d 312, 316 (Iowa 2001) (quoting *State v. Brumage*, 435 N.W.2d 337, 342 (Iowa 1989)). However, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the United States Supreme Court impliedly rejected the no-set-of-circumstances standard in the abortion context and, instead, considered the validity of an abortion regulation among "the group for whom the law is a restriction, not for whom the law is irrelevant." 505 U.S. 833, 894, 112 S. Ct. 2791, 2829 (1992).

There, Pennsylvania's spousal-notification provision would only impose a burden on the 1% of women (in that case) who were victims of domestic violence. *Id.* Although the provision would validly apply to the many women who discuss with their partner their decision to terminate,

the Court instructed, "Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects." *Id.* Because the provision imposed an undue burden upon the class of women actually affected—victims of domestic violence—the Court declared the spousal-notification provision facially unconstitutional. *Id.* at 895, 112 S. Ct. at 2830.

We believe the *Casey* standard is the wiser approach. Abortion regulations impact different women in many different ways. Womanhood is not a monolith. There are few hurdles that are of level height for women of different races, classes, and abilities. There are few impositions that cannot be solved by wealth. Women of means are surely better positioned to weather the consequences of waiting-period requirements. Yet, it is axiomatic that a right that is only accessible to the wealthy or privileged is no right at all. Accordingly, on our review of the Act, we will measure its constitutionality by "its impact on those whose conduct it affects." *Id.* at 894, 112 S. Ct. at 2829.

**V. Legal Analysis.**

**A. Substantive Due Process.**

1. *Substantive due process claims, generally.* The Iowa Constitution guarantees "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. The provision is "nearly identical in scope, import and purpose" to the Federal Due Process Clause. *State v. Hernandez-Lopez*, 639 N.W.2d 226, 237 (Iowa 2002). Despite this likeness, we "jealously guard it as our right and duty to differ from the Supreme Court, in appropriate cases, when construing analogous provisions in the Iowa Constitution." *Hensler v. City of Davenport*, 790 N.W.2d 569, 579 n.1 (Iowa 2010). Accordingly, while we may draw upon precedent from federal courts

when persuasive, we exercise our right to conduct an independent interpretation of our constitution.

PPH's due process claim rests not upon a procedural defect, but rather upon the existence of a substantively inadequate justification for burdening the ability to obtain an abortion.  Substantive due process claims are grounded in our nation's long history of interpreting the text of the Due Process Clause to "impose[] nothing less than an obligation to give substantive content to the words 'liberty' and 'due process of law.' " *Washington v. Glucksberg*, 521 U.S. 702, 764, 117 S. Ct. 2258, 2281 (1997).

When Iowans bring claims alleging a deprivation of substantive due process, we employ a two-stage inquiry.  First, we "determine the nature of the individual right involved."  *Hensler*, 790 N.W.2d at 580.  Second, we determine "the appropriate level of scrutiny to apply."  *Id.*  "If government action implicates a fundamental right, we apply strict scrutiny" and determine whether the disputed action is "narrowly tailored to serve a compelling government interest."  *Id.*  Conversely, if the right at stake is not fundamental, we apply the "rational-basis test," which considers whether there is a "reasonable fit between the government interest and the means utilized to advance that interest." *Hernandez-Lopez*, 639 N.W.2d at 238.

No clear test exists for determining whether a claimed right is fundamental.  However, there are a number of guiding principles. Generally, only those "rights and liberties which are 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' qualify as fundamental."  *State v. Seering*, 701 N.W.2d 655, 664 (Iowa 2005) (quoting *Chavez v. Martinez*, 538 U.S. 760, 775, 123 S. Ct. 1994, 2005 (2003)).  A " '[f]undamental right' for purposes of

constitutional review is not a synonym for 'important.' Many important interests, such as the right to choose one's residence or the right to drive a vehicle, do not qualify as fundamental rights." *King v. State*, 818 N.W.2d 1, 26 (Iowa 2012).

Importantly, "[h]istory and tradition guide and discipline this inquiry but do not set its outer boundaries." *Obergefell v. Hodges*, 576 U.S. ___, ___, 135 S. Ct. 2584, 2598 (2015). Our constitution recognizes the ever-evolving nature of society, and thus, our inquiry cannot be cabined within the limited vantage point of the past. This review "respects our history and learns from it without allowing the past alone to rule the present." *Id.* at ___, 135 S. Ct. at 2598.

> The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning.

*Id.* at ___, 135 S. Ct. at 2598.

Yet, a substantive due process claim "is not easy to prove." *Blumenthal Inv. Trs. v. City of West Des Moines*, 636 N.W.2d 255, 265 (Iowa 2001). The claim is "reserved for the most egregious governmental abuses against liberty or property rights, abuses that 'shock the conscience or otherwise offend . . . judicial notions of fairness . . . [and that are] offensive to human dignity.' " *Id.* (alterations in original) (quoting *Rivkin v. Dover Twp. Rent Leveling Bd.*, 671 A.2d 567, 574–75 (1996)). "With the exception of certain intrusions on an individual's privacy and bodily integrity, the collective conscience of [the court] is not easily shocked." *Id.* (quoting *Rivkin*, 671 A.2d at 575).

2. *Fundamental right.* Over forty years ago, the United States Supreme Court held the "right of privacy," as grounded in the Fourteenth

Amendment's guarantee of personal liberty, was "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 153, 93 S. Ct. 705, 727 (1973). The Court pointed to "a line of decisions" in which it "recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *Id.* at 152, 93 S. Ct. at 726. The Court's prior decisions extended "this guarantee of personal privacy" to the fundamental right to marriage, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 1824 (1967); procreation, *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S. Ct. 1110, 1113 (1942); contraception, *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S. Ct. 1029, 1038 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S. Ct. 1678, 1682 (1965); family relationships, *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 442 (1944); child rearing, *id.* at 166, 64 S. Ct. at 442; and child education, *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S. Ct. 571, 573 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 626 (1923). *Roe*, 410 U.S. at 152–53, 93 S. Ct. at 726–27. Within that sphere of shielded personal autonomy, the Court reasoned, lies the decision whether to continue or terminate a pregnancy. *Id.* at 153, 93 S. Ct. at 727. Thus, the constitutional right to an abortion was grounded in the deeply personal nature of the decision. It is part of the host of personal freedoms that emanate from the concept of "liberty" guaranteed under the Due Process Clause.

Nineteen years later, the Supreme Court revisited *Roe* and affirmed that a woman's constitutionally protected liberty interests include the decision whether to terminate her pregnancy before the point of viability. *Casey*, 505 U.S. at 869–70, 112 S. Ct. at 2816. The Court explained that abortion regulations "touch[] not only upon the private sphere of the

family but upon the very bodily integrity of the pregnant woman." *Id.* at 896, 112 S. Ct. at 2830.

In prior cases, we have found the substantive due process protections embodied in article I, section 9 of the Iowa Constitution encompass the profoundly personal decisions Iowans make about family, procreation, and child rearing. *See McQuistion v. City of Clinton*, 872 N.W.2d 817, 832 (Iowa 2015) ("The right to procreate is implied in the concept of ordered liberty and qualifies for due process protection as a fundamental right."); *In re Guardianship of Kennedy*, 845 N.W.2d 707, 714 (Iowa 2014) ("A statutory scheme that empowered a court-appointed actor . . . to have an intellectually disabled person sterilized without some form of judicial review would raise serious due process concerns."); *Seering*, 701 N.W.2d at 663 ("[T]he familial relationship is a fundamental liberty interest protected by both constitutions."); *Callender v. Skiles*, 591 N.W.2d 182, 190 (Iowa 1999) ("We have repeatedly found fundamental interests in family and parenting circumstances."); *Olds v. Olds*, 356 N.W.2d 571, 574 (Iowa 1984) ("[T]he government is ill-equipped to dictate the details of social interaction among family members. . . . [T]he parenting right is a fundamental liberty interest that is protected against unwarranted state intrusion.").

Here, the State argues there is no similar fundamental right to terminate a pregnancy under the Iowa Constitution. The State contends the Iowa Constitution does not expressly protect the right to an abortion, nor may it be found within any other provision. Specifically, the State urges that abortion was a crime in Iowa when the due process clause was adopted, *see* Revised Statutes of the Territory of Iowa ch. 49, § 10 (1843), and it remained a crime until the *Roe* decision, *see Doe v. Turner*, 361 F. Supp. 1288, 1292 (S.D. Iowa 1973), and thus, it is not deeply

rooted in Iowa's history and traditions. In framing the issue, however, the State misconstrues the true nature of the due process inquiry in this case.

In *Bowers v. Hardwick*, the Supreme Court heard a substantive due process challenge to Georgia's criminal sodomy law. 478 U.S. 186, 187–90, 106 S. Ct. 2841, 2842–43 (1986). The Court framed the constitutional inquiry as whether due process granted "a fundamental right upon homosexuals to engage in sodomy." *Id.* at 190, 106 S. Ct. at 2843. The Court then proceeded to explain, "Proscriptions against that conduct have ancient roots" and determined that "homosexual sodomy" was not "deeply rooted in this Nation's history and tradition." *Id.* at 192–94, 106 S. Ct. 2844–46. This is the same approach used by the State here to exclude abortion as a fundamental right.

However, just seventeen years later, the Court acknowledged its error. *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S. Ct. 2472, 2484 (2003). The Court explained that the *Bowers* Court's narrow framing of the issue "disclose[d] the Court's own failure to appreciate the extent of the liberty at stake." *Id.* at 567, 123 S. Ct. at 2478.

> To say that the issue in *Bowers* was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse. The laws involved in *Bowers* and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home. The statutes do seek to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals.

*Id.*  Accordingly, the actual liberty interest at stake was not the limited right of homosexuals to engage in sodomy, but the fundamental right of consenting adults to engage in private, consensual conduct without government intervention.  *Id.* at 578, 106 S. Ct. at 2484.

Foundational principles such as liberty and due process "were purposely left to gather meaning from experience."  *Nat'l Mut. Ins. of D.C. v. Tidewater Transfer Co.,* 337 U.S. 582, 646, 69 S. Ct. 1173, 1195 (1949) (Frankfurter, J., dissenting).  The doctrines "relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged."  *Id.* at 646, 69 S. Ct. at 1195–96.  "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed."  *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 572, 92 S. Ct. 2701, 2707 (1972).  A constitution would not use concepts to express individual rights and guarantees if specificity were needed.  At the same time, a constitution would express individual rights and guarantees with specificity if concepts could only express those rights and guarantees associated with the concept at the time.

The Iowa Constitution "is a living and vital instrument."  *In re Johnson,* 257 N.W.2d 47, 50 (Iowa 1977).  "[U]nlike statutes, our constitution sets broad general principles. . . .  Its very purpose is to endure for a long time and to meet conditions neither contemplated nor foreseeable at the time of its adoption."  *Id.*  We have explained that our constitution "must have enough flexibility so as to be interpreted in accordance with the public interest.  This means they must meet and be applied to new and changing conditions."  *Pitcher v. Lakes Amusement Co.,* 236 N.W.2d 333, 335–36 (Iowa 1975).  Indeed, we once noted we had

"freed ourselves from the private views of the constitution's framers which were in many cases but accidents of history." *Id.* at 336.

> [I]n determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the framers were not familiar. For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses. Hence we read its words, not as we read legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government.

*Id.* (quoting *United States v. Classic*, 313 U.S. 299, 316, 61 S. Ct. 1031, 1038 (1941)). Our constitutional doctrines "are not necessarily static, and [our analysis] instead considers current prevailing standards that draw their 'meaning from the evolving standards . . . that mark the progress of a maturing society.'" *Griffin v. Pate*, 884 N.W.2d 182, 186 (Iowa 2016) (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01, 78 S. Ct. 590, 598 (1958)). Ultimately, "[t]his approach reveals the enduring strength of our constitution." *Id.*

As the Supreme Court did in *Bowers*, the State here fails to appreciate the extent of the liberty interest at stake when the government impermissibly invades a woman's ability to decide whether to terminate a pregnancy.

> These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.
>
> . . . The mother who carries a child to full term is subject to anxieties, to physical constraints, to pain that only

> she must bear. That these sacrifices have from the beginning of the human race been endured by woman with a pride that ennobles her in the eyes of others and gives to the infant a bond of love cannot alone be grounds for the State to insist she make the sacrifice. Her suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture. The destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society.

*Casey*, 505 U.S. at 851–52, 112 S. Ct. at 2807.

The guarantee of due process under the Iowa Constitution "exists to prevent unwarranted governmental interferences with personal decisions in life." *McQuistion*, 872 N.W.2d at 832. "The decision whether to obtain an abortion is fraught with specific physical, psychological, and economic implications of a uniquely personal nature for each woman." *In re T.W.*, 551 So. 2d 1186, 1193 (Fla. 1989). "The authority to make such traumatic yet empowering decisions is an element of basic human dignity. . . . [A] woman's decision to terminate her pregnancy is nothing less than a matter of conscience." *Casey*, 505 U.S. at 916, 112 S. Ct. at 2840 (Stevens, J., concurring in part and dissenting in part).

> Of all decisions a person makes about his or her body, the most profound and intimate relate to two sets of ultimate questions: first, whether, when, and how one's body is to become the vehicle for another human being's creation; second, when and how—this time there is no question of "whether"—one's body is to terminate its organic life.

Laurence H. Tribe, *American Constitutional Law* 1337–38 (2d ed. 1988).

Parenthood is more than biological procreation. It embraces a bond that defies description, but also a series of social and moral expectations that demand a parent takes responsibility to provide for his or her child. Well into the twenty-first century, this expectation continues to fall disproportionately upon the child's mother. Motherhood

compels devotion and considerable sacrifice. Whether a woman is personally prepared and capable of assuming life-altering obligations and expectations is a decision about which the government has scarce insight.

In *Eisenstadt* and *Griswold,* the Supreme Court recognized a protected liberty interest in married couples and single individuals to be free from unwarranted governmental intrusion in matters as intimate as whether to use contraception. *See Eisenstadt,* 405 U.S. at 453, 92 S. Ct. at 1038 ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."); *Griswold,* 381 U.S. at 485, 85 S. Ct. at 1682. The identified right to "privacy" was not an entitlement to secrecy, but rather the recognition that the government is ill-equipped to intervene in decisions of such personal magnitude as whether to procreate and assume the responsibilities of parenthood.

Autonomy and dominion over one's body go to the very heart of what it means to be free. At stake in this case is the right to shape, for oneself, without unwarranted governmental intrusion, one's own identity, destiny, and place in the world. Nothing could be more fundamental to the notion of liberty. We therefore hold, under the Iowa Constitution, that implicit in the concept of ordered liberty is the ability to decide whether to continue or terminate a pregnancy.

3. *Degree of scrutiny.* Having identified the fundamental nature of the right at issue, we next proceed to the second step of the substantive due process inquiry. In the second step, we determine the "appropriate level of scrutiny to apply" in examining the extent to which the right can be regulated. *Hensler,* 790 N.W.2d at 580. It is well settled that "[i]f a

fundamental right is implicated, we apply strict scrutiny." *Seering*, 701 N.W.2d at 662. Indeed, we have explained, "Substantive due process 'forbids the government [from infringing] certain "fundamental" liberty interests *at all*, no matter what process is involved, unless the infringement is narrowly tailored to serve a compelling state interest.' " *Bowers v. Polk Cty. Bd. of Supervisors*, 638 N.W.2d 682, 694 (Iowa 2002) (alteration in original) (quoting *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 1447 (1993)). However, with respect to state actions that infringe upon the right to terminate a pregnancy, the Supreme Court and some states have seen fit to deviate downward.

In *Roe*, the Court cautioned that the fundamental right to terminate a pregnancy is not absolute. 410 U.S. at 154, 93 S. Ct. at 727. The state's interests in maternal health and promoting potential life are important and may justify intrusion on a woman's decision to terminate a pregnancy. *Id.* Thus, to balance the competing interests of the woman and the state, the Court created a trimester framework. *Id.* at 163–66, 93 S. Ct. at 731–33. During the first trimester, nearly all state regulations are unconstitutional, as the state's interest in protecting maternal health does not become "compelling" until the end of the first trimester. *Id.* at 163, 93 S. Ct. at 731. During the second trimester, regulations "reasonably relat[ing] to the preservation and protection of maternal health" are permitted. *Id.* at 163, 93 S. Ct. at 732. During the third trimester, when the fetus becomes viable, the state's interest in promoting potential life becomes "compelling," and the state may regulate in furtherance of that interest, including going "so far as to proscribe abortion . . . except when it is necessary to preserve the life or health of the mother." *Id.* at 163–64, 93 S. Ct. at 732.

In *Casey*, it reconsidered the trimester framework. 505 U.S. at 873, 112 S. Ct. at 2818 (plurality opinion). The Court concluded it "misconceive[d] the nature of the pregnant woman's interest; and in practice it undervalue[d] the State's interest in potential life." *Id.* Thus, it endeavored to rebalance the interests of the pregnant woman and the state and adopted the "undue burden" standard. *Id.* at 876, 112 S. Ct. at 2820. Under the undue burden standard, the state may enact previability abortion restrictions in furtherance of its interest in promoting potential life. However, the state may not enact a regulation that "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S. Ct. at 2820.

> A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Id.*

The *Casey* Court explained that, under the standard,

> [r]egulations which do no more than create a structural mechanism by which the State . . . may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose.

*Id.* at 877, 112 S. Ct. at 2821. Unless the regulation places a substantial obstacle on a woman's right to choose, "a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal." *Id.* at 878, 112 S. Ct. at 2821.

Several states have opted to apply the undue burden standard under their own constitutions. In *Pro-Choice Mississippi v. Fordice*, the Mississippi Supreme Court considered the appropriate standard for its constitution and adopted the undue burden test. 716 So. 2d 645, 654–55 (Miss. 1998). The court reasoned,

> While we have previously analyzed cases involving the state constitutional right to privacy under a strict scrutiny standard requiring the State to prove a compelling interest, we are not bound to apply that standard in all privacy cases. The abortion issue is much more complex than most cases involving privacy rights. We are placed in the precarious position of both protecting a woman's right to terminate her pregnancy before viability and protecting unborn life. In an attempt to create a workable framework out of these diametrically opposed positions, we adopt the wellreasoned decision in *Casey*, applying the undue burden standard to analyze laws restricting abortion. We do not limit any future application of the strict scrutiny standard for evaluating infringement on a person's right to privacy in other areas.

*Id.* at 655.

Yet, other states have declined to adopt the undue burden standard under their own constitutions. In *Planned Parenthood of Middle Tennessee v. Sundquist*, the Tennessee Supreme Court opted to apply strict scrutiny to abortion regulations, concluding the undue burden standard "is essentially no standard at all." 38 S.W.3d 1, 16 (Tenn. 2000), *superseded by constitutional amendment*, Tenn. Const. art. I, § 36. The court reasoned the undue burden standard "in effect, allows judges to impose their own subjective views of the propriety of the legislation in question." *Id.* Although judges are instructed to review the effects of a regulation, the test fails to

> offer an objective standard by which the effect should be judged. Accordingly, a regulation held to be an undue burden by one judge could just as easily be found to be reasonable by another judge because the gauge for what is an undue burden necessarily varies from person to person.

*Id.* Because the court found the right to decide whether to continue or terminate a pregnancy to be a fundamental right, it declined to exchange the well-established strict scrutiny approach with a test that "would relegate a fundamental right of the citizens of Tennessee to the personal caprice of an individual judge." *Id.* at 17.

No court has held, and we do not today hold, that a woman's right to terminate a pregnancy is unlimited. Like all fundamental rights, it is subject to reasonable regulation. When the legislature seeks to regulate abortions, it generally acts pursuant to two identified state interests. The state has a compelling interest in "protecting the woman's own health and safety" and ensuring that abortions, like other medical procedures, are performed under safe circumstances for the patient. *Roe*, 410 U.S. at 150, 93 S. Ct. at 725. As well, the state has a compelling interest in promoting potential life. *See id.* at 164, 93 S. Ct. at 732 (noting after viability the state may "promot[e] its interest in the potentiality of human life"); *see also Casey*, 505 U.S. at 871, 112 S. Ct. at 2817 (noting the state's interest "in the protection of potential life").

However, in giving the state its due recognition that its interests are compelling, we must also hold the state to its convictions under the constitution. A regulation must further the identified state interest that motivated the regulation not merely in theory, but in fact. Demanding a connection between the restriction and the state's objective ensures the government is not virtually unrestrained in its ability to regulate a fundamental right.

When a state regulates abortion in furtherance of its interest in potential life, the undue burden standard solely measures the impact the regulation has on women's ability to receive the procedure. *See Planned Parenthood of the Heartland*, 865 N.W.2d at 263 (noting the Supreme

Court "applies the undue burden test differently depending on the state's interest advanced by a statute or regulation" and explaining the Court only balances the burdens against the benefits when considering regulations aimed at protecting maternal health). More, however, can be at stake. A standard that only reviews the burdens of the regulation fails to guarantee that the objective of the regulation is, in fact, being served and is inconsistent with the protections afforded to fundamental rights.

Moreover, the undue burden standard tasks judges with safeguarding women's liberty interests by gauging the types of barriers women can reasonably be expected to overcome and the types that may prove too great. Justice Scalia, though he disagreed that the constitution protects women's reproductive decisional autonomy, argued the undue burden standard "place[s] all constitutional rights at risk." *Casey*, 505 U.S. at 988, 112 S. Ct. at 2878 (Scalia, J., concurring in part and dissenting in part). He explained,

> The inherently standardless nature of this inquiry invites the district judge to give effect to his personal preferences about abortion. By finding and relying upon the right facts, he can invalidate, it would seem, almost any abortion restriction that strikes him as "undue"—subject, of course, to the possibility of being reversed by a court of appeals or Supreme Court that is as unconstrained in reviewing his decision as he was in making it.

*Id.* at 992, 112 S. Ct. at 2880.

"The undue burden test requires a judge to consider only the effect of the governmental regulation. It fails, however, to offer an objective standard by which the effect should be judged." *Sundquist*, 38 S.W.3d at 16. We agree with the Tennessee Supreme Court that the undue burden standard "offers . . . no real guidance and engenders no expectation among the citizenry that governmental regulation of abortion will be objective, evenhanded, or well-reasoned." *Id.* at 17.

Narrow tailoring, conversely, replaces a judge's subjective understandings as to what obstacles women can conceivably withstand in pursuit of exercising a fundamental right with a well-established framework that measures the relationship between the government's objective and its chosen means. Narrow tailoring, while undoubtedly constraining the government's capacity to act in furtherance of its compelling interests, ensures all state forays into constitutionally protected spheres are judiciously fashioned and commit no greater intrusion than necessary.

Ultimately, adopting the undue burden standard would relegate the individual rights of Iowa women to something less than fundamental. It would allow the legislature to intrude upon the profoundly personal realms of family and reproductive autonomy, virtually unchecked, so long as it stopped just short of requiring women to move heaven and earth. By applying the narrow tailoring framework, however, we fulfill our obligation to act as a check on the powers of the legislature and ensure state actions are targeted specifically and narrowly to achieve their compelling ends. The guarantee of substantive due process requires nothing less. Accordingly, we conclude strict scrutiny is the appropriate standard to apply.

4. *Disposition.* Applying strict scrutiny, we consider whether the statute is "narrowly tailored to serve a compelling state interest." *Santi*, 633 N.W.2d at 318 (quoting *State v. Klawonn*, 609 N.W.2d 515, 519 (Iowa 2000)).

The Act expressly declared that its purpose was to "enact policies that protect all unborn life." 2017 Iowa Acts ch. 108, § 5. The State has further clarified that the Act is an "informed choice" provision designed to provide important information to Iowa women in the hope that, after

taking some time to consider the information, some women will choose to continue a pregnancy they otherwise would have terminated. The State indeed has a compelling interest in promoting potential life and in helping people make informed choices in life.

Importantly, the factual question in this case is not whether some women enter PPH clinics conflicted or even whether some women benefit from additional time to consider their options. The record confirms that PPH's current same-day regime ensures that women who are conflicted or who need more time are, in fact, given extra time or are given the resources to pursue other options. Rather, the factual issue in this case is whether requiring all women to wait at least three days between the informational and procedural appointments will impact patient decision-making.

Without a mandatory delay in effect, the evidence showed that women who are conflicted in their decision or under duress do not receive the procedure and, instead, are given more time to consider or given resources to pursue alternatives. The imposition of a waiting period may have seemed like a sound means to accomplish the State's purpose of promoting potential life, but as demonstrated by the evidence, the purpose is not advanced. Instead, an objective review of the evidence shows that women do not change their decision to have an abortion due to a waiting period.

The Roberts study was the only study presented in this case that actually inquired into why some women ultimately decide to continue with their pregnancy. In that study, 2% of women who were certain in their decision upon arrival changed their minds from wanting an abortion to deciding to continue with their pregnancy. Yet, in jurisdictions without mandatory waiting periods, between 1% and 3% of

women who are similarly certain in their decision upon arrival change their minds from wanting an abortion to deciding to continue with the pregnancy. Thus, the study that is most probative of the factual issue in this case demonstrates that mandatory waiting periods have no effect on patient decision-making.

The finding by the district court that "at least eight percent" of Iowa women will likely change their minds under the Act is premised upon the misreading of several studies discussed at trial. The "eight percent" figure drawn by the district court from the Roberts study did not just include the 2% of women who did change their decision after the waiting period from having an abortion to continuing with their pregnancy. It also included the 6% of women who continued with their pregnancy after the waiting period but either intended to continue their pregnancy at the time of the first appointment or were conflicted and had not yet made a decision. It was an error to include this group of women. In determining the effect of imposing a waiting period on the decision to take any action, it would be incongruous to consider those people who have not yet decided to act. If a person has not yet decided to act, the person is in a state of waiting to act. Thus, the imposition of a waiting period under this circumstance cannot be a factor in changing the decision. A decision must first be made before it can be changed.

Moreover, we do not know how many women in the study entered their appointments uncertain in their decision and then, after the waiting period, decided to have the abortion. Thus, the study not only fails to show how a mandatory waiting period reduces abortions by increasing the number of women who change their decisions, but it also does not show that *more* women in the group that begin the abortion process in a

state of uncertainty or with no intention to terminate will continue their pregnancies.

Accordingly, the Roberts study can only be read to support the conclusion that patients who are certain in their decision upon arrival are unaffected by waiting periods. And the record demonstrates that those who are uncertain in their decision upon arrival do not receive the procedure under PPH's same-day regime. In the application of our constitution, care must be taken in analyzing and drawing the essential conclusions from the evidence essential to the determination of its rights and guarantees.

The district court's reliance on the Gatter, White, and Sanders studies to support its figure is similarly misplaced. Dr. Gatter's Los Angeles study is not relevant to the factual issue in this case, as it did not assess whether receiving information and then observing a mandatory waiting period impacts patient decision-making. Further, the court overlooked testimony from PPH's witnesses explaining the Gatter study did not address causation and thus did not find that viewing an ultrasound caused women to forego the abortion. Dr. White's Alabama study did not conclude that 18.8% of women did not go through with the procedure, nor did it assess the causal relationship between the waiting period and the decision to have an abortion. Indeed, both PPH and the State clarified during trial that the White study was not probative of decision-making. Finally, the first portion of the Sanders study—which the court relied on—exclusively reviewed statistics and did not attempt to discern why women did not return for their procedure. PPH's witnesses explained the study might well indicate that the women were *prevented* from returning, rather than *decided* not to return.

Moreover, the district court failed to take the Ralph, Rocca, and Grossman studies into consideration. These studies demonstrate that abortion patients are firm in their decisions, the typical abortion patient has an over 99% chance of reporting that the decision to terminate was right for her, and that waiting periods do not impact decisional certainty.

In truth, the evidence conclusively demonstrates that the Act will not result in a measurable number of women choosing to continue a pregnancy they would have terminated without a mandatory 72-hour waiting period. Moreover, the burdens imposed on women by the waiting period are substantial, especially for women without financial means. Under the Act, patients will need to make two trips to a PPH clinic since it is likely they would not be readily able to obtain certification from a local, non-PPH provider. The Act requires poor and low-income women, which is a majority of PPH patients, to amass greater financial resources before obtaining the procedure. Patients will inevitably delay their procedure while assembling the resources needed to make two trips to a clinic.

The district court considered this evidence and found that "women will have the ability to account for the additional time to schedule two appointments." Yet, most women do not discover a pregnancy until at least five weeks after their last menstrual period. Other women cannot discover a pregnancy until later due to their contraception masking the symptoms of pregnancy. Women take the necessary time to research their options, talk to their loved ones, and make the decision whether to continue with their pregnancy. If a woman decides to seek an abortion, she must then raise the funds to travel to and pay for both appointments. If a woman does not have money to put gasoline in her

car, she cannot go to the appointment. Women therefore cannot simply schedule their initial appointment earlier.

Due to the Act's delay, some patients will be pushed beyond the twenty-week surgical abortion cutoff and others will be pushed beyond the ten-week medication abortion window and will be denied the procedure of their choice. The delay will also expose women to additional medical risk. Finally, victims of domestic abuse and sexual assault will endure additional hardships, including jeopardized confidentiality.

Strict scrutiny requires state actions be narrowly tailored to further a compelling state interest. The overwhelming weight of the evidence demonstrates that requiring all women, regardless of decisional certainty, to wait at least seventy-two hours between appointments will not impact patient decision-making, nor will it result in a measurable number of women choosing to continue a pregnancy they otherwise would have terminated without the mandatory delay. The Act, therefore, does not, in fact, further any compelling state interest and cannot satisfy strict scrutiny.

Even if the Act did confer some benefit to the State's identified interest, it sweeps with an impermissibly broad brush. The Act's mandatory delay indiscriminately subjects all women to an unjustified delay in care, regardless of the patient's decisional certainty, income, distance from the clinic, and status as a domestic violence or rape victim. The Act takes no care to target patients who are uncertain when they present for their procedures but, instead, imposes blanket hardships upon all women.

Unlike mandatory delay statutes in other states, the Act does not provide an exception for rural women who live far from health centers. *See* Tex. Health & Safety Code Ann. § 171.012(a)(4) (West, Westlaw

through 2017 Reg. and 1st Called Sess. of 85th Leg.); Va. Code Ann. § 18.2-76(B) (West, Westlaw through 2017 Reg. Sess.). *See generally* Lisa R. Pruitt & Marta R. Vanegas, *Urbanormativity, Spatial Privilege, and Judicial Blind Spots in Abortion Law*, 30 Berkeley J. Gender L. & Just. 76 (2015). Nor does it provide an exception for rape or incest victims. *See* Utah Code Ann. § 76-7-305(9)(c)–(d) (West, Westlaw current with 2018 Gen. Sess. effective through April 1, 2018). Nor does it provide exceptions for victims of domestic violence or human trafficking. *See* Fla. Stat. Ann. § 390.0111(3)(b) (West, Westlaw through 2018 2d Reg. Sess.), *invalidated on other grounds by Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1265 (Fla. 2017).

Reasonable minds unquestionably diverge as to the morality of terminating a pregnancy. "It is conventional constitutional doctrine that where reasonable people disagree the government can adopt one position or the other. That theorem, however, assumes a state of affairs in which the choice does not intrude upon a protected liberty." *Casey*, 505 U.S. at 851, 112 S. Ct. at 2806–07 (majority opinion) (citations omitted). We do not, and could not, endeavor to discern the precise moment when a human being comes into existence. We have great respect for the sincerity of those with deeply held beliefs on either side of the issue. Nevertheless, the state's capacity to legislate pursuant to its own moral scruples is necessarily curbed by the constitution. The state may pick a side, but in doing so, it may not trespass upon the fundamental rights of the people.

Because it cannot satisfy strict scrutiny, we hold the "seventy-two hour[]" waiting requirement of Division I of Senate File 471 violates due process under the Iowa Constitution. *See* Iowa Code § 146A.1(1).

**B. Equal Protection.** While we conclude the Act is unconstitutional under the due process clause, we further consider the impact of the Act on our equal protection clause. Although not required, it can serve to cast a greater light of understanding on a divisive issue in society. *See Obergefell,* 576 U.S. at ___, 135 S. Ct. at 2602–05 (striking down state prohibitions of same-sex marriage under both the Due Process and Equal Protection Clauses).

The Iowa Constitution guarantees "[a]ll men and women are, by nature, free and equal." Iowa Const. art. I, § 1. It further promises "[a]ll laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." *Id.* art. I, § 6. Our constitution's guarantee of equal protection of the law is "the very foundation principle of our government." *Coger v. Nw. Union Packet Co.,* 37 Iowa 145, 153 (1873).

Liberty and equality are intertwined. "Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always co-extensive, yet in some instances each may be instructive as to the meaning and reach of the other." *Obergefell,* 576 U.S. at ___, 135 S. Ct. at 2603. As our understanding of fundamental liberties and intolerable inequalities deepens and evolves with time, so too does our understanding of what "freedom is and must become." *Id.*

For much of our state's, and nation's, history, biological differences have been used to justify women's subordinate position in society. In *In re Carragher,* this court affirmed a statute that effectively prevented female pharmacists from obtaining licenses to sell alcohol. 149 Iowa 225, 229–30, 128 N.W. 352, 353–54 (1910). We explained that although "a woman may be a competent pharmacist, and as such be capable and

worthy to receive a permit, . . . the law could not permit the sex to engage in the retail liquor traffic generally without serious injury to public morals." *Id.* at 229, 128 N.W.2d at 353. We then found "the fact that in many instances individuals of one sex are in general better fitted than those of the other sex for a given occupation or business is one of such common knowledge and observation that the Legislature" is free to enact statutes pursuant to it. *Id.* at 229–30, 128 N.W.2d at 354.

In *Bradwell v. Illinois*, the Supreme Court affirmed the State of Illinois's policy denying women licenses to practice law. 83 U.S. (16 Wall.) 130, 139 (1872). In his concurring opinion, Justice Bradley offered his view on the definitive role of women in society.

> [T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interest and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband. . . .
>
>    . . . The paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator. And the rules of civil society must be adapted to the general constitution of things, and cannot be based upon exceptional cases.

*Id.* at 141–42 (Bradley, J., concurring).

Yet, as time has progressed, so too have our understandings of freedom and equality. Disparate treatment and relegation of women to a subject sex may no longer be accomplished through the proxy of role differentiation.

Reviewing courts must scrutinize challenged statutes in a manner "free of fixed notions concerning the roles and abilities of males and females. Care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724–25, 102 S. Ct. 3331, 3336 (1982). Equal protection of the law now prevents governments from "den[ying] to women, simply because they are women, full citizenship stature—equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capabilities." *United States v. Virginia*, 518 U.S. 515, 532, 116 S. Ct. 2264, 2275 (1996). "Inherent differences" between the sexes "remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity." *Id.* at 533, 116 S. Ct. at 2276. And "such classifications may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women." *Id.* at 534, 116 S. Ct. at 2276 (citation omitted).

Implicit in the concept of ordered liberty, we recognize today, is the ability to decide whether to terminate a pregnancy. Profoundly linked to the liberty interest in reproductive autonomy is the right of women to be equal participants in society. As Justice Ginsburg once described the issue, "in the balance is a woman's autonomous charge of her life's full course . . ., her ability to stand in relation to man, society, and the state as an independent, self-sustaining, equal citizen." Ruth B. Ginsburg, *Some Thoughts on Autonomy and Equality in Relation to* Roe v. Wade, 63 N.C. L. Rev. 375, 383 (1985).

Autonomy is key in addressing the equal protection claim presented in this case. Autonomy is the great equalizer. Laws that diminish women's control over their reproductive futures can have

profound consequences for women. Some women embrace them and never look back. Others, however, do look back and see a trajectory in life different from men. Without the opportunity to control their reproductive lives, women may need to place their educations on hold, pause or abandon their careers, and never fully assume a position in society equal to men, who face no such similar constraints for comparable sexual activity. Societal advancements in occupational opportunities are meaningless if women cannot access them. Policies that make education more affordable are meaningless if women are kept out of reach. Equality and liberty in this instance, as in so many others, are irretrievably connected.

When a state action infringes upon a fundamental right, the guarantee of equal protection of the law requires the state to demonstrate the action is narrowly tailored to serve a compelling government interest. *Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005). As discussed, we conclude the Act cannot satisfy strict scrutiny. Thus, we hold the "seventy-two hour[]" waiting requirement of Division I of Senate File 471 violates the right to equal protection under the Iowa Constitution.

## VI. Conclusion.

For the foregoing reasons, the judgment of the district court is reversed. The language in Iowa Code section 146A.1(1) requiring physicians to wait "at least seventy-two hours" between obtaining written certification and performing an abortion is stricken from the statute. *See* Iowa Code § 4.12 (codifying the severability doctrine).

**REVERSED.**

All justices concur except Mansfield and Waterman, JJ., who dissent.

**MANSFIELD, Justice (dissenting).**

Abortion is one of the most divisive issues in America today. Each side in the debate is motivated by a serious, legitimate concern: on the one hand, a woman's ability to make decisions regarding her own body; on the other, human life.

Whatever one may think of the United States Supreme Court's abortion cases, they recognize this point. As Justices O'Connor, Kennedy, and Souter wrote for the Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey*,

> Abortion is a unique act. It is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one's beliefs, for the life or potential life that is aborted.

505 U.S. 833, 852, 112 S. Ct. 2791, 2807 (1992). Accordingly, in *Casey*, the Court concluded, "Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed." *Id.* at 872, 112 S. Ct. at 2818 (plurality opinion). "States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning." *Id.* at 873, 112 S. Ct. at 2818.

Unfortunately, the majority opinion lacks this sense of balance and perspective. Forgoing accepted methods of constitutional interpretation, the opinion instead relies at times on an undertone of moral criticism toward abortion opponents. From reading the majority opinion, one would barely know that abortion—with few exceptions—was

continuously illegal in Iowa from the time our constitution was adopted until the United Supreme Court overrode our law by deciding *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705 (1973). From reading the majority opinion, one would scarcely be aware that many women in Iowa are pro-life and strongly support the same law the court concludes unconstitutionally discriminates against them.

After considering the text, original meaning, and subsequent interpretation of the constitutional provisions at issue, the record in this case, the district court's carefully written decision, and abortion cases from around the country, I conclude that the waiting period in Senate File 471 does not violate either article I, section 9 or article I, section 6 of the Iowa Constitution.

**I. The Majority Disregards the Text and Original Understanding of the Constitutional Provisions at Issue.**

I will begin where constitutional interpretation ought to begin: with the relevant constitutional provisions. Article I, section 9 states, "[N]o person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. Article I, section 6 provides, "All laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." *Id.* art. I, § 6.

Neither provision as worded or as originally understood supports a right—let alone a fundamental right—to terminate a pregnancy. I will examine article I, section 9 first. The majority presumably concludes that a *law* mandating a 72-hour waiting period for an abortion is a "depriv[ation] of . . . liberty . . . without due process of *law*." *Id.* art. I, § 9 (emphasis added).

This sounds like a contradiction. How can a law deny due process of law? Indeed, our framers would have found the notion of substantive due process as self-contradictory as it sounds. The Chairman of the Committee on the Bill of Rights, Mr. Ells, explained to the convention that this clause had been "transcribed . . . from" the United States Constitution, and that due process means "no person shall be deprived of life, liberty or property, without a legal proceeding based upon the principles of the common law, and the constitution of the United States." 1 *The Debates of the Constitutional Convention of the State of Iowa* 101–02 (W. Blair Lord rep., 1857) [hereinafter *The Debates*], www.statelibraryofiowa.org/ services/collections/law-library/iaconst. The due process clause, in other words, guarantees certain *procedures*. The idea of substantive due process would have made no sense to our framers.

Turning to article I, section 6, it consists of two clauses: one requiring uniformity and the other prohibiting special privileges and immunities. Iowa Const. art. I, § 6. A 72-hour waiting period for an abortion is uniform, and it doesn't grant a special privilege.

An article that I cowrote examined the original understanding of article I, section 6. Edward M. Mansfield & Conner L. Wasson, *Exploring the Original Meaning of Article I, Section 6 of the Iowa Constitution*, 66 Drake L. Rev. 147 (2018). I won't repeat the article, which goes into the convention debates and other contemporary sources, but the article concludes, "The uniformity clause was designed to be a barrier against geographic discrimination, the privileges and immunities clause a barrier against government-bestowed monopolies (or oligopolies)." *Id.* at 201.

Additionally, the Iowa Constitution—including article I, section 9 and article I, section 6—became effective on September 3, 1857. Six

months later, on March 15, 1858, the general assembly adopted a law making abortion a crime under all circumstances, "unless the same shall be necessary to preserve the life of such woman." 1858 Iowa Acts ch. 58, § 1 (codified at Revisions of 1860, Statutes of Iowa § 4221). Abortion remained generally illegal in Iowa until *Roe v. Wade* was decided over one hundred years later. Given this timing, i.e., the fact that a *ban* on abortion was adopted right after the constitution became effective, it is difficult to conceive that a legislatively mandated *waiting period* for abortion would have violated the original understanding of either article I, section 9 or article I, section 6.

Of course, "originalism is not the only available tool in constitutional interpretation." *State v. Seats*, 865 N.W.2d 545, 577 (Iowa 2015) (Mansfield, J., dissenting). But the majority wants it both ways. In the first part of its opinion, the majority quotes a number of broad, general pronouncements by the framers of our constitution at the 1857 convention. Yet the majority ignores that which is far more relevant— (1) the text those framers actually approved, and (2) what they said concerning the meaning of that text. For example, the majority quotes Mr. Ells's general remarks on the importance of a Bill of Rights, but ignores what Mr. Ells said specifically one page later concerning the meaning of the due process clause. *See* 1 *The Debates* at 101–02.

Yes, the framers debated and adopted an extensive bill of rights. But they did so because the specific text and meaning of each right mattered.

The majority tries to align itself with two opinions of our court from the 1970s and one opinion from 2016, implying that they endorsed its notion of a living constitution. *See Griffin v. Pate*, 884 N.W.2d 182 (Iowa

2016); *In re Johnson*, 257 N.W.2d 47 (Iowa 1977); *Pitcher v. Lakes Amusement Co.*, 236 N.W.2d 333 (Iowa 1975). There is a difference.

*Pitcher* presented the question whether a rule allowing for nonunanimous civil jury verdicts violated article I, section 9 of the Iowa Constitution. 236 N.W.2d at 334. We held it did not. *Id.* at 338. We reasoned that article I, section 9 preserved "the general concept of a right to jury trial" but did not freeze every characteristic that a jury trial had in 1857. *Id.* As we stated, "From obvious necessity a carefully limited flexibility was developed in the construction of constitutions." *Id.* at 336.

*Johnson* involved a constitutional challenge to the lack of jury trials in juvenile delinquency proceedings. 257 N.W.2d at 48. We concluded that neither article I, section 9 nor article I, section 10 of the Iowa Constitution required jury trials. *Id.* at 48, 51. We pointed out that the juvenile court system did not exist in 1857 and that a constitution's purpose is "to meet conditions neither contemplated nor foreseeable at the time of its adoption." *Id.* at 50.

*Griffin* involved the constitutionality of a law denying the vote to anyone who had committed a felony. 884 N.W.2d at 185. This turned on the meaning of "infamous crime" as used in our state constitution. *Id.* We said that "the concept of infamy is not locked into a past meaning"; it could evolve. *Id.* at 186. However, even based on "community standards of today," all felonies remained infamous crimes, and there was no constitutional violation. *Id.* at 198.

Thus, in all three cases—*Pitcher*, *Johnson*, and *Griffin*—we recognized that the Iowa Constitution was living in the sense that it could adapt to *legislative enactments* reflecting new societal needs. *See Griffin*, 884 N.W.2d at 185–86, 198–205; *Johnson*, 257 N.W.2d at 48; *Pitcher*, 236 N.W.2d at 334–35. This makes sense, since it is primarily

the job of the elected branches of government, not the judiciary, to be responsive to changing conditions. "Statutes do not serve as constitutional definitions but provide us the most reliable indicator of community standards to gauge the evolving views of society important to our analysis." *Griffin*, 884 N.W.2d at 198.

This case involves something quite different. Here, by contrast, the majority has used the living constitution not as a means of adapting to "the community standard expressed by our legislature," *id.* at 205, but as a way of erecting a strict scrutiny barrier to legislative action without reference to the constitutional text or history.

We may not personally agree with the legislature's judgments. I made it clear that I did not believe someone convicted of a felony who had completed her or his sentence should be denied the right to vote. *Chiodo v. Section 43.24 Panel*, 846 N.W.2d 846, 863 (Iowa 2014) (Mansfield, J., specially concurring). In the end, though, that's irrelevant.

## II. The Majority's One-Sided Substantive Due Process Analysis Does Not Give Due Consideration to the Interests on Each Side.

Although I doubt that our framers contemplated substantive due process as part of article I, section 9, our court does have a line of substantive due process cases in the area of parenting and procreation. The majority cites these. *See McQuistion v. City of Clinton*, 872 N.W.2d 817, 833 (Iowa 2015) (recognizing a fundamental right to procreate); *In re Guardianship of Kennedy*, 845 N.W.2d 707, 714–15 (Iowa 2014) (recognizing a fundamental right to procreate); *State v. Seering*, 701 N.W.2d 655, 663–64 (Iowa 2005) (recognizing a right to live with one's family); *Callender v. Skiles*, 591 N.W.2d 182, 190–92 (Iowa 1999) (recognizing the due process rights of a biological father); *Olds v. Olds*,

356 N.W.2d 571, 574 (Iowa 1984) (recognizing that how to parent a child implicates a fundamental liberty interest).

I agree with the majority to this extent: One can reasonably read these precedents and conclude that laws relating to abortion also implicate substantive due process rights. Still, there is a crucial difference. In none of those other areas was there a fundamental interest on the other side of the ledger. The fact that there are *two* profound concerns—a woman's autonomy over her body and human life—has to drive any fair-minded constitutional analysis of the problem. As I have already pointed out, it underlies the "undue burden" standard set forth in *Casey.*

Regrettably, instead of admitting there are two weighty concerns, the majority eloquently describes one of these concerns while diminishing the other. Thus, the majority states, and I agree, that "[a]utonomy and dominion over one's body go to the very heart of what it means to be free." And later the majority defines abortion in terms of "[w]hether a woman is personally prepared and capable of assuming life-altering obligations and expectations." I agree that being a parent is a life-altering obligation that falls unevenly on women in our society.

But abortion has another aspect to which the majority gives short shrift. Referring to the anti-abortion side, the majority uses the word "life" at times, but typically as part of the phrase "promoting potential life." This anodyne phrasing treats restrictions on abortion as if they were analogous to tax credits for having more children. Elsewhere, the majority characterizes Senate File 471 as based on "moral scruples" against abortion. Here again, the majority's language minimizes the anti-abortion position. As a practical matter, it equates opposition to abortion with opposition to gambling.

To be clear, many if not most abortion opponents view it as *ending a life.*[8]

### III. Since *Casey*, Most Waiting Periods Have Been Upheld Under the Undue Burden Standard.

The relevant United States Supreme Court precedent on waiting periods is *Casey*, 505 U.S. 833, 112 S. Ct. 2791. In *Casey*, the Supreme Court rejected a constitutional challenge to the waiting period in the Pennsylvania Abortion Control Act of 1982, which required that a woman seeking an abortion be given specified information at least twenty-four hours before the abortion was performed. *Id.* at 844, 112 S. Ct. at 2803 (majority opinion).

Thus, the Supreme Court held a state's regulation of abortion will not be deemed unconstitutional unless it is an undue burden on the woman's right. *Id.* at 877, 112 S. Ct. at 2820–21 (plurality opinion). A regulation is an undue burden if "its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.* at 878, 112 S. Ct. at 2821. Nevertheless, "not every law which makes a right more difficult to exercise is, *ipso*

---

[8]I am also troubled by the majority's view that failing to recognize abortion "as a fundamental right" is legally equivalent to upholding laws against "homosexual sodomy." In *Lawrence v. Texas*, the Supreme Court noted there was only limited historical basis for such sodomy laws and even more limited historical basis for their enforcement. 539 U.S. 558, 567–71, 123 S. Ct. 2472, 2478–80 (2003). The Court concluded, "Laws prohibiting sodomy do not seem to have been enforced against consenting adults acting in private." *Id.* at 569; 123 S. Ct. at 2479.

Apart from any historical differences, there is a more basic difference between an act which many view as extinguishing a human life and one which affects nobody but its participants. For the *Lawrence* Court, it was dispositive that the state was relying entirely on moral concerns to ban purely private conduct between consenting adults that did not involve "injury to a person." *Id.* at 567, 123 S. Ct. at 2478. Obviously, the Supreme Court does not share the majority's theory of equivalence because it invalidated a law against homosexual sodomy in *Lawrence* but has adhered to the undue burden test set forth in *Casey*.

*facto*, an infringement of that right." *Id.* at 873, 112 S. Ct. at 2818. The Court elaborated,

> Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure. The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

*Id.* at 874, 112 S. Ct. at 2819. "Not all burdens on the right to decide whether to terminate a pregnancy will be undue." *Id.* at 876, 112 S. Ct. at 2820.

Contrary to the majority's view, *Casey*'s undue burden standard was not an unprincipled decision by Justices O'Connor, Kennedy, and Souter "to deviate downward" in constitutional jurisprudence. It was an effort to recognize the unique status of this particular constitutional conflict between a woman's autonomy and respect for human life.

Based upon this framework, the Supreme Court concluded the 24-hour waiting period imposed by the Pennsylvania law was constitutional and not an undue burden. *Id.* at 887, 112 S. Ct. at 2826. It stated,

> The idea that important decisions will be more informed and deliberate if they follow some period of reflection does not strike us as unreasonable, particularly where the statute directs that important information become part of the background of the decision.

*Id.* at 885, 112 S. Ct. at 2825. In so doing, the Court acknowledged many of the arguments raised here by Planned Parenthood:

> The findings of fact by the District Court indicate that because of the distances many women must travel to reach an abortion provider, the practical effect will often be a delay of much more than a day because *the waiting period requires*

*that a woman seeking an abortion make at least two visits to the doctor.* The District Court also found that in many instances this will increase the exposure of women seeking abortions to "the harassment and hostility of anti-abortion protestors demonstrating outside a clinic." As a result, the District Court found that for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24–hour waiting period will be "particularly burdensome."

*Id.* at 885–86, 112 S. Ct. at 2825 (emphasis added) (quoting *Planned Parenthood of Se. Pa. v. Casey*, 744 F. Supp. 1323, 1351–52 (E.D. Pa. 1990)).

Yet in the end, the *Casey* Court concluded that the waiting period, despite "increasing the cost and risk of delay of abortions," was not a substantial obstacle to the woman's ultimate decision. *Id.* at 886, 112 S. Ct. at 2825 (quoting *Casey*, 744 F. Supp. at 1378). As one court has put it, "*Casey* thus makes clear that the substantial obstacle test is, as the name suggests, substantial." *Tucson Women's Ctr. v. Ariz. Med. Bd.*, 666 F. Supp. 2d 1091, 1098 (D. Ariz. 2009). Particularly,

[i]t requires more than State-sponsored informed consent and State-sponsored advocacy for childbirth. It requires more than delay and inconvenience. Indeed, even when the restriction in question is "particularly burdensome" for women with few financial resources, women who must travel long distances, and women who may have difficulty explaining their whereabouts to husbands, employers, or others, the Supreme Court held that the burden does not rise to the level of a substantial obstacle that invalidates the statute.

*Id.*; *see also Karlin v. Foust*, 188 F.3d 446, 484, 486 (7th Cir. 1999); *Utah Women's Clinic, Inc. v. Leavitt*, 844 F. Supp. 1482, 1487–88 (D. Utah 1994), *rev'd in part on other grounds, appeal dismissed in part*, 75 F.3d 564 (10th Cir. 1995).

Waiting periods are not uncommon in Iowa law. We have a three-day waiting period for marriage. *See* Iowa Code § 595.4 (2018). There is

a 72-hour waiting period after birth for adoption. *See id.* § 600A.4(2)(*g*). There is a ninety-day waiting period for divorce. *See id.* § 598.19. All of these waiting periods implicate fundamental constitutional interests in marriage and parenting. The legislature mandated waiting periods to ensure these important life decisions were made after time for reflection. No one can reasonably question the legislature's power to impose these waiting periods before Iowans begin or end a marriage or give up a newborn baby for adoption. So why can't the legislature impose a waiting period before an abortion?

A clear majority of courts since *Casey* have upheld abortion waiting periods under both state and federal constitutions. *See Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 372–74 (6th Cir. 2006) (finding a 24-hour waiting period mandated by Ohio law not an undue burden); *A Woman's Choice–E. Side Women's Clinic v. Newman*, 305 F.3d 684, 685, 692–93 (7th Cir. 2002) (declaring an 18-hour waiting period under Indiana law not an undue burden); *Karlin*, 188 F.3d at 485–86 (finding that a 24-hour delay imposed hardships "generally no different than those the Court in *Casey* held did not amount to an undue burden"); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1467 (8th Cir. 1995) (noting South Dakota's 24-hour waiting period was "virtually identical" to those previously upheld and was not an undue burden); *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 527, 535 (8th Cir. 1994) (finding arguments raised against North Dakota's 24-hour waiting period were "substantially similar" to those raised in *Casey* and provision not an undue burden); *Barnes v. Moore*, 970 F.2d 12, 14–15 (5th Cir. 1992) (per curiam) (noting Mississippi's 24-hour waiting period was not an undue burden under Federal Constitution); *Tucson Women's Ctr.,* 666 F. Supp. 2d at 1104–05 (declining to issue preliminary

injunction because "[p]laintiffs have failed to show that they are likely to succeed in their claim that the 24–hour provision imposes an undue burden on the right of Arizona women to an abortion"); *Summit Med. Ctr. of Ala., Inc. v. Siegelman*, 227 F. Supp. 2d 1194, 1206 (M.D. Ala. 2002) (refusing to enjoin Alabama's Woman's Right to Know Act, which provided 24-hour waiting period); *Eubanks v. Schmidt*, 126 F. Supp. 2d 451, 456 (W.D. Ky. 2000) ("Simply put, the twenty-four hour informed consent period makes abortions marginally more difficult to obtain, but . . . it does not fundamentally alter any of the significant preexisting burdens facing poor women who are distant from abortion providers."); *Leavitt*, 844 F. Supp. at 1487–88 ("Even if [Utah law] were to specifically mandate two visits to the abortion clinic for every woman, it could not be found facially unconstitutional on those grounds."); *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 976, 987–88 (Ind. 2005) (concluding Indiana's 18-hour waiting period was not an undue burden under Indiana Constitution); *Pro-Choice Miss. v. Fordice*, 716 So. 2d 645, 656 (Miss. 1998) ("Because the mandatory consultation and twenty-four hour delay ensures that a woman has given thoughtful consideration in deciding whether to obtain an abortion, [Mississippi law] does not create an undue burden and is therefore constitutional."); *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 185 S.W.3d 685, 691–92 (Mo. 2006) (en banc) (per curiam) (concluding Missouri's 24-hour waiting period was not an undue burden); *Preterm Cleveland v. Voinovich*, 627 N.E.2d 570, 579 (Ohio Ct. App. 1993) (finding no facial invalidity under Ohio Constitution of a law establishing a 24-hour waiting period).

Two state supreme courts have invalidated waiting periods after rejecting the undue burden test. *Gainesville Woman Care, LLC v. State*,

210 So. 3d 1243, 1254, 1263–64 (Fla. 2017) (enjoining a 24-hour waiting period under Florida Constitution); *Planned Parenthood of Middle Tenn. v. Sundquist,* 38 S.W.3d 1, 16, 24 (Tenn. 2000) (invalidating Tennessee's 48-hour waiting period). As I discuss below, one of those states (Florida) has express privacy language in its constitution; the other state case (Tennessee) is no longer controlling law in Tennessee because it was overruled by a constitutional amendment.[9]

Also, in *Planned Parenthood of Delaware v. Brady,* the court enjoined a 24-hour waiting period because the law lacked an exception for a medical emergency that was not life-threatening. 250 F. Supp. 2d 405, 410 (D. Del. 2003). In any event, Senate File 471 includes exceptions both to protect the mother's life and for a medical emergency. 2017 Iowa Acts ch. 108, § 1 (codified at Iowa Code § 146A.1(2)(*b*)) ("Compliance with the prerequisites of this section shall not apply to . . . [a]n abortion performed in a medical emergency.").

Only two trial courts have invalidated waiting periods while applying the undue burden test. *See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health,* 273 F. Supp. 3d 1013, 1043

---

[9]The amendment provides in part, "Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion." Tenn. Const. art. I, § 36. The dissent in *Sundquist* turned out to be prescient:

> Undoubtedly, the issue of abortion is one of the most controversial and fiercely debated political issues of our time, and any resolution of this issue can only be achieved through deliberative, thoughtful, and public dialogue. Nevertheless, with its decision today, the Court has elevated one extreme of this debate to a constitutional level and has made any meaningful compromise on this issue all but impossible. The Court has done so simply by proclaiming that the right to obtain an abortion is "fundamental" under the Tennessee Constitution, and that as such, our Constitution effectively removes from the General Assembly any power to reach a reasonable compromise that considers all of the important interests involved.

38 S.W.3d at 25 (Barker, J., dissenting in part and concurring in part).

(S.D. Ind. 2017) (granting preliminary injunction against enforcement of an Indiana law that required an 18-hour waiting period and an ultrasound before obtaining abortion) (appeal pending); *Planned Parenthood of Minn., N.D., S.D. v. Daugaard*, 799 F. Supp. 2d 1048, 1065–66 (D.S.D. 2011) (concluding South Dakota's 72-hour delay was an undue burden); *see also June Med. Servs. v. Gee*, 280 F. Supp. 3d 849, 869 (M.D. La. 2017) (denying a motion to dismiss a challenge to a 72-hour waiting period in Louisiana because the plaintiffs sufficiently pleaded that the law imposed an undue burden).

Eight states have laws currently in force with waiting periods longer than twenty-four hours. *See* Ala. Code § 26-23A-4(a) (Westlaw current through 2018-579) (forty-eight hours); Ark. Code Ann. § 20-16-1703(b)(1) (West, Westlaw current through 2018 Fiscal Sess. & 2d Extraordinary Sess.) (forty-eight hours); La. Stat. Ann. § 1061.17(B)(3)(a) (Westlaw current through 2018 1st Extraordinary Sess.) (seventy-two hours); Mo. Ann. Stat. § 188.039(2) (West, Westlaw current through 2018 2d Reg. Sess.) (seventy-two hours); N.C. Gen. Stat. Ann. § 90-21.82(1) (West, Westlaw current through 2017 Reg. Sess.) (seventy-two hours); Okla. Stat. Ann. tit. 63, § 1-738.2(B)(1) (West, Westlaw current through ch. 17 of 2d Extraordinary Sess.) (seventy-two hours); Tenn. Code Ann. § 39-15-202(d)(1) (West, Westlaw current through 2018 2d Reg. Sess.) (forty-eight hours); Utah Code Ann. § 76-7-305(2)(a) (West, Westlaw current through various chs. of 2018 Gen. Sess.) (seventy-two hours).

As the foregoing discussion indicates, the United States Supreme Court has upheld a 24-hour waiting period in *Casey*; other courts generally follow *Casey*; and several other states besides Iowa have 72-hour waiting periods in effect that have not been enjoined.

Planned Parenthood's main argument against the constitutionality of the waiting period in Senate File 471 is that it will require a woman to make "two trips" in order to obtain an abortion. I do not discount this argument. However, this precise argument was made and rejected in *Casey.* The majority makes no attempt to distinguish *Casey.* In the end, I don't think one can distinguish it. The majority simply says it is not the test under the Iowa Constitution.

**IV. Other States Apply the Undue Burden Standard Under Their State Constitutions, and Those That Don't Generally Have Privacy Language Not Found in Iowa's Constitution.**

A number of states have relied on the undue burden test in evaluating the constitutionality of abortion restrictions under their state constitutions. *Hope Clinic for Women, Ltd. v. Flores*, 991 N.E.2d 745, 757, 763 (Ill. 2013); *Brizzi*, 837 N.E.2d at 983–84 (applying a "material burden" standard under the Indiana Constitution that is "the equivalent of *Casey*'s undue burden test"); *Hodes & Nauser, MDs, P.A. v. Schmidt*, 368 P.3d 667, 676 (Kan. Ct. App. 2016) (en banc), *review granted* (Apr. 11, 2016); *Fordice*, 716 So. 2d at 655; *Nixon*, 185 S.W.3d at 691–92; *see also Planned Parenthood Ariz., Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d 181, 189 (Ariz. Ct. App. 2011) (applying the undue burden test after finding that the Arizona Constitution recognizes no more expansive right to an abortion).

I acknowledge that some other states have rejected the undue burden test, as the majority has done today. Yet a crucial distinction is that those states typically have explicit guarantees of privacy in their constitutions. And for the most part, those privacy guarantees have been adopted only recently.

In *Valley Hospital Ass'n v. Mat-Su Coalition for Choice*, the Alaska Supreme Court expressly rejected the undue burden test expounded in *Casey.* 948 P.2d 963, 969 (Alaska 1997). The court relied on an Alaska Constitution provision that states, "The right of the people to privacy is recognized and shall not be infringed." *Id.* at 968 (quoting Alaska Const. art. I, § 22). The court noted that "[t]his express privacy provision was adopted by the people in 1972" and "provides more protection of individual privacy rights than the United States Constitution." *Id.*

In *Gainesville Woman Care, LLC*, the Florida Supreme Court struck down Florida's mandatory 24-hour waiting period as violating the right to privacy in the Florida Constitution added by voters in 1980. 210 So. 3d at 1247, 1252, 1265. The court explained that this standard meant a challenger had no obligation to show the law imposed an "undue burden or significant restriction." *Id.* at 1255.

Similarly, in Montana, the state supreme court struck down an abortion restriction and rejected the undue burden standard. *Armstrong v. State*, 989 P.2d 364, 384 (Mont. 1999). The court based its decision to depart from federal precedent on the presence of a separate privacy provision in the Montana Constitution, which had been added in 1972. *Id.* at 372–74; *see also* Mont. Const. art. II, § 10 (adopted 1972).

*Sundquist* departed from federal precedent and declined to follow the undue burden standard even though Tennessee's constitution has no specific privacy guarantee. 38 S.W.3d at 16–17. As previously noted, though, that decision was overturned by a Tennessee constitutional amendment. *See* Tenn. Const. art. I, § 36 (amended 2014).

Hence, states relying on the due process clauses of their state constitutions typically have applied the undue burden test.[10]

Like those other state courts, I would apply *Casey* under the Iowa Constitution, at least until the Supreme Court offers a different legal standard for our consideration. As of now, I am persuaded by the thoughtful and nuanced analysis undertaken by Justices O'Connor, Kennedy, and Souter for the Supreme Court plurality in *Casey.*

The majority's requirement of "strict scrutiny" and "narrow tailoring"—combined with its rejection of *Casey*'s undue burden standard—would make any abortion restriction very difficult to sustain. In recent years, only in the areas of sexually violent predators and termination of parental rights have we found that a law or ordinance passed strict scrutiny review in our court. *Compare In re L.M.,* 654 N.W.2d 502, 505–07 (Iowa 2002), *and In re Det. of Garren,* 620 N.W.2d 275, 286 (Iowa 2000), *with Mitchell County v. Zimmerman,* 810 N.W.2d 1, 16–18 (Iowa 2012), *In re A.W.,* 741 N.W.2d 793, 811 (Iowa 2007), *Spiker v. Spiker,* 708 N.W.2d 347, 352 (Iowa 2006), *In re S.A.J.B.,* 679 N.W.2d 645, 650–51 (Iowa 2004), *Lamberts v. Lillig,* 670 N.W.2d 129, 133 (Iowa 2003), *and Santi v. Santi,* 633 N.W.2d 312, 321 (Iowa 2001).

The majority caricatures the undue burden test. It says that such a test enables the State to adopt any abortion restriction "so long as it stop[s] just short of requiring women to move heaven and earth." I am

---

[10]Some states have applied strict scrutiny to abortion legislation, but have neither approved nor rejected the undue burden test. *See Doe v. Maher*, 515 A.2d 134, 156–57 (Conn. Super. Ct. 1986); *Moe v. Sec'y of Admin. & Fin.*, 417 N.E.2d 387, 402–04 (Mass. 1981); *Women of State of Minn. ex rel. Doe v. Gomez*, 542 N.W.2d 17, 31 (Minn. 1995); *Right to Choose v. Byrne*, 450 A.2d 925, 933–34 (N.J. 1982).

Michigan state courts have found no right to an abortion at all in their state constitution. *Mahaffey v. Att'y Gen.*, 564 N.W.2d 104, 109–11 (Mich. Ct. App. 1997).

puzzled by this hyperbole. It ignores the fact that *Casey* struck down one of Pennsylvania's laws—a spousal-notification provision—under the undue burden test, even though the law had a number of exceptions. 505 U.S. at 887–98, 112 S. Ct. at 2826–31 (majority opinion). It ignores the fact that two abortion waiting periods have been enjoined by federal district courts under the undue burden test. *Planned Parenthood of Ind. & Ky., Inc.*, 273 F. Supp. 3d at 1043; *Planned Parenthood of Minn., N.D., S.D.*, 799 F. Supp. 2d at 1065–66. It ignores the fact that our court has repeatedly struck down laws in other areas even when applying a more forgiving standard than the undue burden test. *See, e.g., Hensler v. City of Davenport*, 790 N.W.2d 569, 588–89 (Iowa 2010); *State v. Dudley*, 766 N.W.2d 606, 617, 622 (Iowa 2009); *Varnum v. Brien*, 763 N.W.2d 862, 896, 904 (Iowa 2009); *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 16 (Iowa 2004).[11]

---

[11]Besides the *Casey* undue burden test and the majority's approach, there is a third alternative. In *Casey*, four dissenters took the following position:

> The States may, if they wish, permit abortion on demand, but the Constitution does not *require* them to do so. The permissibility of abortion, and the limitations upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting.

505 U.S. at 979, 112 S. Ct. at 2873 (Scalia, J., concurring in the judgment in part and dissenting in part).

On a blank slate, I might agree with this view, but we have now been living under *Casey* for a generation. Although *Casey* is inconsistent with the original understanding of our framers, substantive due process has evolved and our court has previously indicated that article I, section 9 protects certain rights related to procreation and families. *See McQuistion*, 872 N.W.2d at 833; *Callender*, 591 N.W.2d at 190–91. As I've already noted, a number of state supreme courts have followed *Casey* under their own constitutions. The State does not advocate for a standard other than the *Casey* undue burden test in this case. In the past, I have criticized our court for "freelancing under the Iowa Constitution without the benefit of an adversarial presentation." *State v. Tyler*, 830 N.W.2d 288, 299 (Iowa 2013) (Mansfield, J., dissenting). For now, I find *Casey* persuasive.

**V. The Waiting Period in Senate File 471 Does Not Violate the Undue Burden Standard.**

I must now confront whether the waiting period in Senate File 471 passes the undue burden test. The issue is a close one, but I believe it does.

To begin with, I believe the 72-hour waiting period—like other waiting periods for important decisions—serves a legitimate purpose. Although various studies were discussed in the district court, only the Utah study directly addresses the relevant issues. *See* Sarah C.M. Roberts, et al., *Utah's 72-Hour Waiting Period for Abortion: Experiences Among a Clinic-Based Sample of Women*, 48 Persp. on Sexual & Reprod. Health 179 (2016) [hereinafter Roberts].

This published, peer-reviewed study directly examined the effect of Utah's 72-hour waiting period by following up with a sample of 309 women who had sought abortion services. *Id.* Of these women, twenty-seven reported that they were no longer seeking an abortion after the mandatory waiting period. *Id.* at 182. This is approximately 8% of the women surveyed. To quote the study itself, "Eight percent of women reported changing their minds." *Id.* at 185.

Approximately 4000 abortions are performed each year in Iowa, approximately 3000 by Planned Parenthood. Thus, the State extrapolates from the Utah data that a 72-hour waiting period would likely result in 320 fewer abortions (8% of 4000) being performed in Iowa.

The majority concludes that the number is much lower because only 2% out of the 8% started out *certain* they wanted to have an abortion. Others were more conflicted. The majority then compares this number to the 1 to 3% who change their minds in jurisdictions without mandatory waiting periods.

The majority's comparison is apples to oranges, however. If 8% decide not to have an abortion when *there is a waiting period* and 1 to 3% decide not to have an abortion when *there is no waiting period*, the difference made by the waiting period is 5 to 7%, or approximately 200 to 280 fewer abortions per year.

Alternatively, one can subtract from the 8% the 3% who indicated in the baseline survey that they preferred to have the baby, on the theory that they would have been screened out by Planned Parenthood anyway. That leaves 5% who wanted to have the abortion, even though some may have had a degree of conflict.

In addition, the Utah study challenges the majority's view as to the overall burdens resulting from a 72-hour waiting period. The study states, "[A]lthough some advocates argue that logistical difficulties presented by two-visit requirements and waiting periods make women unable to have abortions, this was not the case in our study cohort." *Id.* (footnote omitted)

Thus, based on a scholarly study of actual experience, a 72-hour waiting period leads to at least 5 and potentially as much as 8% of women changing their minds, but does not prevent a woman who still wanted an abortion after the waiting period from getting one. It does result in "logistical and financial difficulties, including increasing the cost of having an abortion by about 10%." *Id.*

Second, the majority overlooks the role of Planned Parenthood's own business decisions. In 2008, Iowa became the first state where telemedicine abortions were widely performed. *Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med.*, 865 N.W.2d 252, 255 & n.1 (Iowa 2015). A telemedicine abortion involves a remote video connection to a physician who is not physically present in the clinic. *Id.* at 255.

By October 2013, Planned Parenthood had fifteen clinics throughout Iowa that provided abortion services. When the Iowa Board of Medicine adopted a rule prohibiting telemedicine abortions, Planned Parenthood sued to enjoin the rule and represented that it would be forced to close clinics unless it could continue telemedicine abortions. *See id.* at 261, 268. Applying the *Casey* standard under the Iowa Constitution, we found in favor of Planned Parenthood and struck down the rule. *Id.* at 269. We noted the board of medicine had adopted a separate rule that generally *approved* the use of telemedicine in medical procedures. *Id.* We further noted that there had been little discussion before the board as to how the telemedicine abortion rule would protect a woman's health. *Id.* In sum, we said, "It is difficult to avoid the conclusion that the Board's medical concerns about telemedicine are selectively limited to abortion." *Id.* I joined the opinion because, under *Casey*, I was not convinced the board's telemedicine abortion rule served its stated medical purpose.[12]

---

[12]As we noted in our previous *Planned Parenthood* case, the Supreme Court "applies the undue burden test differently depending on the state's interest advanced by a statute or regulation." *Planned Parenthood of the Heartland*, 865 N.W.2d at 263. In other words, *Casey* distinguished between health-related measures and informed-choice measures for purposes of the undue burden test. *See id.* at 263–64; *see also Casey*, 505 U.S. at 878, 112 S. Ct. at 2821 (plurality opinion). With a health-related measure, we concluded that *Casey* "requires us to weigh the strength of the state's justification for a statute against the burden placed on a woman seeking to terminate her pregnancy." *Planned Parenthood of the Heartland*, 865 N.W.2d at 264.

A year later, the Supreme Court confirmed that we had read federal precedent correctly. In *Whole Woman's Health v. Hellerstedt*, the Supreme Court struck down two health-related restrictions on the performance of abortions, concluding that "neither of these provisions confers medical benefits sufficient to justify the burdens upon access that each imposes." 579 U.S. ___, ___, 136 S. Ct. 2292, 2301 (2016).

This case, of course, involves the other prong of *Casey*: informed decision-making.

Yet Planned Parenthood closed clinics anyway. Today it has five clinics in Iowa.[13] If Planned Parenthood still operated fifteen clinics, many of the concerns raised by the majority would not exist.

Planned Parenthood provided no information as to its budget or finances. We are asked to take it on faith that Planned Parenthood could not operate more clinics or open those clinics on more days by either raising additional funds, reducing expenses, or using its existing funds differently. As a nonprofit charitable entity, Planned Parenthood's operations are already subject to public scrutiny to a significant degree, for example, through the filing of Form 990's with the IRS.

Third, the majority relies a great deal on hypothetical examples developed by a Wisconsin professor of community environmental sociology. But this witness claimed—incorrectly—there are no data on women who are actually unable to get an abortion because of waiting periods. As she put it, "We have identified some factors that make some women more vulnerable than others, but there is no data." In fact, the Utah study provided those data, and they showed one woman out of 309 was unable to have an abortion because the waiting period pushed her outside the permissible time window. Roberts, 48 Persp. on Sexual & Reprod. Health at 185.

*Casey* emphasized that under the undue burden test, "[w]hat is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so." 505 U.S. at 877, 112 S. Ct. at 2821 (plurality opinion). "[T]he State may take measures to ensure that

---

[13]Some but not all of the closings were due to the legislature's decision no longer to reimburse Planned Parenthood for providing family planning services. The majority implicitly criticizes the legislature for cutting off funds for nonabortion-related services. I believe we should not participate in this policy debate, which is not before us and is not part of the present case.

the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion." *Id.* at 878, 112 S. Ct. at 2821. "[U]nder the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest." *Id.* at 886, 112 S. Ct. at 2825.

*Casey* reasoned that "at some point increased cost could become a substantial obstacle," but a "slight" increase in cost would not be. *Id.* at 901, 112 S. Ct. at 2833. *Casey* also reasoned that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894, 112 S. Ct. at 2829.

The majority misconstrues this last statement from *Casey*. With a facial challenge to a waiting period, under *Casey*, the plaintiff must consider the group of persons for whom the law is a restriction. Presumably, that is almost all women seeking an abortion in Iowa, because almost all of them would not choose to wait seventy-two hours after their initial abortion-related appointment to undergo the abortion. The majority, however, focuses on subsets of those persons, such as rape victims and the indigent. That would be appropriate for an as-applied challenge, not a facial one. With a facial challenge, the plaintiff must show that the law operates as a substantial obstacle in "a large fraction" of the cases where it is a restriction at all. *Id.* at 895; 112 S. Ct. at 2830.[14]

---

[14]I might agree with the majority that a 72-hour waiting period ought to have an exception for victims of rape. The majority notes that Senate File 471 has no such exception. Yet for the majority this is really beside the point because the majority would invalidate the law *with or without* such an exception.

Having said all this, I believe the issue is indeed close. Common sense tells me that waiting periods lead to more considered decision-making and to some changes of mind. The Utah study quotes women who, after the 72-hour waiting period, "just couldn't do it" and changed their mind. Roberts, 48 Persp. on Sexual & Reprod. Health at 182.

But common sense also tells me that requiring two trips will result in emotional and financial costs. It will make it more difficult for some women to have medication abortions and force them into riskier and more invasive surgical abortions. Inevitably, a 72-hour waiting period will end up being longer than seventy-two hours in many cases.

Ultimately, I give considerable weight to the empirical evidence from Utah, to *Casey*'s express approval of a 24-hour period despite the fact that it would necessitate two trips, and to other federal and state court decisions sustaining waiting periods. I cannot conclude that the 72-hour waiting period in Senate File 471 is facially invalid under article I, section 9 of the Iowa Constitution.

**VI. The Waiting Period in Senate File 471 Does Not Violate Article I, Section 6.**

Article I, section 6 does not present as close a question for me. I do not follow the majority's reasoning that Senate File 471 violates equal protection of the laws. Equal protection requires treating *similarly* situated people alike, *see, e.g., Tyler v. Iowa Dep't of Revenue*, 904 N.W.2d 162, 166 (Iowa 2017), yet the very gist of the majority's argument is that women are situated *differently* from men. They alone bear the burdens of pregnancy. The majority cites no other court that has accepted this line of thinking—i.e., that an abortion restriction per se discriminates against all women while unconstitutionally favoring men. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270, 113

S. Ct. 753, 760 (1993) ("Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class—as is evident from the fact that men and women are on both sides of the issue.").

The majority of course does not need to reach article I, section 6, since it has already invalidated the 72-hour waiting period under article I, section 9. Thus, I wonder if the majority is laying groundwork instead, perhaps a stepping stone toward a ruling that Iowa's Medicaid program must *fund* abortions. *See, e.g.*, *Harris v. McRae*, 448 U.S. 297, 338, 100 S. Ct. 2701, 2706 (1980) (Marshall, J., dissenting) (arguing that denial of Medicaid funding for medically necessary abortions "is a form of discrimination repugnant to the equal protection of the laws guaranteed by the Constitution").

In lieu of citing supportive caselaw, the majority asserts that without the benefit of the majority's ruling, women may "never fully assume a position in society equal to men, who face no such similar constraints for comparable sexual activity."

This statement, to my mind, epitomizes the difficulties with the majority opinion. I am confident that many Iowans wholeheartedly agree with the court's statement. However, I am equally confident many Iowans are offended by it. Is it really the basis on which the court wishes to render an enduring constitutional decision?

For the foregoing reasons, I would affirm the judgment of the district court.

Waterman, J., joins this dissent.